Hemphill, O. J.
Tbe original instrument in tbe Spanish language has been sent up with tbe record, and from a slight inspection I should not suppose the verb amparar, as used in tbe document, to mean tbe giving of preferent possession, or of any possession at all, but rather as securing the land to tbe claimant until be can be placed in possession, or, as it is expressed in tbe original, “ hasta que se le meta en posesión.”
Several points have been ably and zealously discussed in tbe argument of this cause, but it will not be necessary to examine any other than tbe one raised by tbe demurrer, viz.: Whether tbe injunction should not be dissolved for want of equity on tbe face of tbe bill.
*(561) "We will not consider the point raised on the legality of the alienation of this claim to the deceased intestate. He will be regarded aa possessing all the right which, under the title and by the laws of the land, could be claimed by Carabajal, the vendor.
Is this title or claim sufficiently recognized by the laws of the country, since the declaration of independence, to authorize its assertion in a court of justice?
It will not be denied that the new government, springing out of a successful revolution, has the power of annulling the laws of the former government, and abrogating the rights defined, prescribed and protected by those laws.
While the absolute uncontrollable supremacy of the new sovereignty is admitted, the modern usages of nations would frown upon a general destruction of private rights, and the preservation and protection of these, in subordination, however, to the ends to be accomplished by the change of government, is regarded as a duty of high and sacred obligation. 7 Pet. 87.
The convention of the republic of Texas, in their supreme sovereign capacity, were neither unmindful of their power nor regardless of their duties, or of the rights of the inhabitants whom they represented and were bound to protect.
They declared it to be one of their great duties, to quiet the people in the enjoyment of .their lands; and to accomplish this great purpose the more effectually, they declared a claim for eleven hundred leagues of land, which they regarded as unjust and fraudulent, and all surveys and grants founded upon the said claim, to be utterly null and void. They also declared all eleven leagues of land, located within twenty leagues of the boundaries between Texas and the United States, contrary to the laws of Mexico, to be null and void; and that all location, surveys and titles to lands made since the closing of the land office were likewise null and void.
They further determined that, with a view to the simplification of the land system, and the protection of the people from litigation and fraud, a general land office should be established, where all the land titles of the republic should be registered, and the whole territory of the republic sectionized in a manner to be hereafter prescribed by law, in order that, with facility and certainty, it might be ascertained what lands were vacant, and what covered with valid titles.
They further declare “ that all orders of survey legally obtained by any citizen of the republic, from any legally authorized commissioner, prior to the act of the late consultation closing the land offices, shall be valid.”
*(562) And they also declare that the general welfare of the people, demanding a suspension of the operations of the land office and of the whole land system, no survey or title thereafter to be made should be valid unless such survey or title should be authorized by the convention or some future congress of the republic.
In these various provisions the convention, while annulling fraudulent and unjust titles or claims, and subjecting those which were inchoate to the control of future legislation, manifested their sovereign pleasure that the people should be quieted in the enjoyment of their lands; recognized the existence of their titles and ordered them to be registered in the land office, to be established for that purpose. No allusion is made to surveys of land, as distinct from orders of survey or complete titles, but certain orders of survey are declared to be valid.
This provision is controlled and affected by the subsequent restriction, that no survey or title to be thereafter made shall be valid, unless authorized by the convention, or a furure congress of the republic. 'Under this qualification the government retained the absolute control over all future surveys and titles to any portion of the public domain.
Let us now inquire to what extent claims to lands under the constitution and orders of survey of a previous date have been recognized by the laws of the country, and provision made for their perfection into titles, or for the severance from the public domain of the portions respectively due to the several individual claimants.
In this investigation, it will be unnecessary to refer to any acts of congress, previous to the one adopted on the 14th December, 1837, entitled “an act to reduce into one act, and to amend the several acts relating to the establishment of a general land office.”
By the 6th section oí this act the commissioner of the general land office has the custody and control of all boohs, records, papers, original documents, etc., appertaining to the titles to lands heretofore denominated archives. By the 40th, each county was constituted a section, and the county surveyor was required to procure a map on which plats of all the deeded lands in the county should be made, so as to mahe a fair showing of the same.
These sections were, it is presumed, in compliance with the constitutional provision, requiring the registration of land titles in a general land office, and the sectionizing of the territory of the republic.
By the 11th section, a board of land commissioners was instituted for the investigation of all claims on the government for headrights to lands.
*(563) Tbeir jurisdiction was limited to tbe investigation of claims for headrights. The proof upon which such claims could be 'established was clearly defined and positively prescribed, and all orders of survey for headrights, procured under the colonization laws previous to the declaration of independence, were directed to be submitted to the examination of the land commissioners, and the holders of the same, whether they were original claimants or their heirs or assignees, were subjected to the same formalities and requisitions in procuring said headrights, as were pointed out for other individuals in the law.
This provision is a legislative construction of the extent and class of claims, in which orders of survey were guarantied by the constitution, and was intended, in the sense in which they understood the terms of the fundamental law, to give the guaranty its full force and effect.
It is obvious that the congress regarded the commissioner spoken of in the constitution, as a commissioner of a colony authorized to grant titles to colonists or settlers for their headright claims, and that the orders of survey, protected by the constitution, were those issued by such commissioner to colonists and settlers for such claims.
That this was the understanding of the legislative authority is manifest from the fact that no provision whatever was made in any other section of the same law, or by any other law, for the investigation of orders of survey other than for headrights, nor for a survey on such orders, nor was there even the slightest recognition of their existence.
It is true that the commissioner of the general land office is authorized to grant to all persons holding an order of survey, legally obtained previous to the closing of the land office, and having a survey which was made, agreeably to said order and in conformity to law in all respects, a patent for the same.
This provision without qualification would recognize an order of survey (where an actual survey was made) for any amount of land, which by the laws of the former government could be included in one grant, but the right was modified by the restriction that the holder must present the certificate of some board of land commissioners, that he was entitled to the quantity of land s'urveyed and making such proof to them as is required by law, and upon his paying the several fees as the laws require. The jurisdiction of the board .was limited to the investigation of claims for headrights and issuing certificates therefor on legal proof, and by the 12th section, orders of survey were directed fo be submitted and the holders required to furnish the same proof as all other claimants.
The requisition in the 20th section of a certificate from the board *(564) of land commissioners, before the patent issues, shows that the order of survey must necessarily be for a headright, which by law must have been investigated by a board and sanctioned by a new certificate for the amount of land embraced in the said order; and by the 20th and the 12th sections this new certificate could not issue until the holder should furnish all the proof requisite for the establishment of an original headright claim.
The only benefit secured by the 20th section is to give colonists and settlers a right to the identical lands surveyed for them before the closing of the land offices, and it does not exempt them from proving the genuineness of their claims, tested in the manner prescribed by law for all other individuals.
The legislative authorities have, from that time to the present, given the same' construction to the constitutional provision.
By no act have they recognized the validity or existence of any other than headright orders of survey, and in none have they prescribed any mode for their investigation, confirmation or for any advance, even the slightest, towards their completion into perfect titles.
It belongs to the legislative department to give construction and effect to provisions of the constitution regulating the disposition and distribution of the public domain. It is placed within its control by the express provisions of that instrument, and it appertains not to the judiciary to determine authoritatively whether the provisions are susceptible of a different construction or to attempt, in any mode not sanctioned by law, the survey and distribution of the public lands of the country.
Were it admitted that the terms are susceptible of a more extended signification — embracing all orders of survey, yet, until this construction be adopted by the legislature, until they be recognized and their survey be sanctioned by statute, they must remain in the dormant condition impressed upon them by the constitution — destitute of vital energy, and furnishing no more authority for a severance of a portion of the public domain, than if they had never existed or been declared totally null and void by the constitution.
The document on which the claim of the petition is founded is inferior to an order of survey, with the point of beginning defined.
It operates merely in its own language as a res guardo or protection to the claimant, until the survey can be ordered and the title of possession issued by an authorized commissioner.
An “ ampara,” given to one in possession, secures him in that possession; to a claimant, protects him merely in his claim.
Let it be regarded, however, as an order of survey with a point of *(565) commencement, it is then a location, but without metes or bounds and incapacitated from acquiring locality or limits, for the reason that a survey not being authorized by statute is prohibited and invalidated by the constitution. And this inhibition against surveys on all claims of this character, having now continued for nearly twelve years without change or modifiaation, should operate as a complete bar and preclusion of all right under the claims.
What might be the effect of their future revival by legislative action, it is unneccessary to inquire.
They are now without animating substance, and cannot be regarded as subsisting claims, capable of being enforced against the government or against individuals. Should a survey be permitted on such claims, then the action of the government creating boards of land commissioners was unnecessary, and the requisitions of the law directing the investigation of orders of survey for headrights and their establishment only on the most strict proof were onerous and superfluous.
The doctrines which would justify a judicial tribunal in ordering a survey, prohibited by the constitution, would authorize a claimant under the laws of colonization or the constitution or holding a floating order of survey, to apply without any special authority of law to a district court, and having established his claim to the satisfaction of the court, obtain a warrant and have the quantity of land claimed abstracted from the public domain.
The results of snch doctrines are so monstrous and preposterous as to demonstrate their fallaciousness and absurdity.
If the survey on this claim be allowed them, an order of survey for a claim over a league and labor would be placed on much higher grounds than one for a headright. The holder of the former could have his survey without proof of residence in the country at the declaration of independence, or continuance herein afterwards without oath as to his patriotic conduct and participation in the war, and without the payment of government dues upon the land; while the holder of the latter, although the same might have been surveyed before the closing of the land offices in 1835, is compelled to re-establish his claim to the amount of land contained in his order and survey by the same oath and the same plenary proof, and all other requisites prescribed indiscriminately for claimants under the law of 1837.
This distinction would result from the principles upon which a survey of this claim is supported, and it is one which cannot be presumed to be founded on any intentional act or omission of the legislative de *(566) partment, nor is it, in fact sanctioned or tolerated by the constitution or laws of the country.
The headrights of colonists and settlers and their titles have always been regarded as among the most favored class of claims and titles. Their conditions have been to a great extent dispensed with, while those attached to claims and titles for a larger amount are still impending over the titles. And the supposition that greater favor was extended to incipient claims for a larger amount are still impending over the titles. And the supposition that greater favor was extended to incipient claims for a larger amount than there was to headrights can be justified only on clear, positive, legal provisions.
It has no foundation on the laws as they exist, and is wholly irrational and inadmissible.
It is contended that the 23d section of the statute of limitations — Laws of 1811, p. 170 — authorizes this action. By that section “all certificates for headrights, land scrip, bounty warrant or any other evidence of right to land, recognized by the laws of this government, which have been located or surveyed, shall be deemed and held as sufficient title to authorize the maintenance of actions of ejectment, trespass or any other legal remedy given by law.”
Whatever may be the true signification of the terms “ any other evidence of right to land recognized by the laws of this government,” they are not sufficiently comprehensive to embrace a location without defined boundaries, and to which limits can never be assigned, without further action of the legislative authorities. Such locations only as could be legally surveyed were in the contemplation of the legislature, and not those, the surveys of which are forbidden, and with a prohibition which seems perpetual.
It is also contended that this title should be respected on the ground that the supreme court of the United States has confirmed inchoate titles to lands not separated from the public domain, except by a beginning point for the survey.
It will be found on examination of the principles of the decisions on the Louisiana and Florida land claims, in cases where the laws under which they acted bear any analogy to the legislative acts of this country, that they give no countenance or standing to a claim of the character of the one set up by the petitioner.
It is not our intention to analyze to any extent these decisions, or to detail the provisions of law or of the treaties on which they were based. Had these treaties contained inhibitions similar to those of our constitution, it is not to be supposed, at least as an inference deducible from any of the adjudged cases, that the supreme court would *(567) have authorized surveys on any claims, except on such as were recognized by the political authority, and were on investigation directed to be confirmed and surveyed.
The treaty by which Louisiana was acquired protected in its third article, the inhabitants in the free enjoyment of their property. Now, an order of survey is doubtless a species of property, and may be more valuable when it is floating, and can be located on any portion of the public domain, than when it is descriptive and attached some locality.
TJnder the former government of Louisiana, a floating order of survey could have been located, surveyed and titles of possession issued with as much facility and certainty, as they could have been in our territory under the government of Coahuila and Texas.
Yet, notwithstanding the protection afforded to property in general terms by the treaty, orders of survey, not identified with some particular locality, were not recognized by the courts of the United States, or permitted to be surveyed out of the public domain.
They held in relation to claims under the treaty of 1803, that they could not be confirmed under the acts of congress of 1824 and 1828, unless they were for some tract of land described therein, so as to make it capable of a definite location-; or, if the order of survey was without description or limitation as to place, it must have been surveyed by a proper officer before the 10 th March, 1804.
They did not hold that they could exceed the limitations imposed upon them by the laws of 1824 and 1828, giving them jurisdiction, and from any indefinite notions of the meaning of the terra property, in the third article of the treaty, confirm or enforce claims, however genuine they might be or valuable to the owner, submitted by the laws to their cognizance.
They regarded the 6th and llth'sections of the act of 1824 as restricting their jurisdiction to claims identified with some spot or locality which on confirmation could be surveyed, or on rejection might thenceforth be deemed and taken as a portion of the public domain.
The principles which guided their decisions, control our action on this claim. They could not locate floating orders of survey because they had not been recognized by the political authorities, and submitted by the laws of their adjudication; much less can we authorize surveys prohibited or suspended by the constitution; and which prohibition or suspension has not been removed; and it is immaterial whether the orders or survey are with or without a beginning point, as in either case the boundary cannot be fixed without a survey; and *(568) this is prohibited by the fundamental law. Smith v. United States, 10 Pet. 332-5; Buyck v. The United States, 15 id. 215; O’Hara v. United States, id. 275; United States v. Delespine, id. 319; United States v. Miranda, 16 id. 153.
There are later decisions of this high tribunal, in which they assert in emphatic terms that no standing can be given in courts of justice to inchoate claims under the former government of Louisiana and Florida, until recognized by the political authority of the United States. In Choteau v. Exkhart, they sanction the principles of the decisions of the supreme court of Missouri, in Byrd v. Montgomery, 6 Mo. 514; and Mackay v. Dillon, 7 id. 10; viz.: that the treaty of Louisiana imposed on the government of the United States only a political obligation to perfect such inchoate claims that this obligation, sacred as it may be, cannot, in any instance, be enforced by the action of judicial tribunals, and that the legislation of congress from 1804 to the present time has always proceeded on this construction of the treaty. 2 How. 375. See also Barry v. Gamble, 3 How. p. 56.
In the case of Les Bois v. Brammel, 4 How. p. 459, these doctrines are again fully discussed and re-asserted in terms the most positive and emphatic. The concession <# the plaintiff had been surveyed before the change of government, and it was insisted that by the third article of the treaty of Louisiana, and by the laws of nations, she had a vested interest in the land which could not be defeated by acts of congress, declaring claims to be barred unless presented within a prescribed period for investigation and confirmation. This assumption was acknowledged to be true in the abstract, but it was held that the grant, being incomplete, was still under the control of the granting power of the former government, that this power was in a great degree political, and altogether the exercise of royal authority; that by the treaty the United States assumed the same exclusive right to deal with the title in their political and sovereign capacity, nor could courts of justice be permitted to interfere; “if they could, and by their decrees complete the title, all power over the subject might have been defeated, not by the courts of the Union only, but by the state courts also, and therefore the contemporary construction and practical understanding of the treaty for forty years has been, that claims, like the plaintiff’s had no standing in a court of justice until confirmed by congress or its authority.” That the patent of the plaintiff could not, by relation, take date from the concession so as to overreach subsequent confirmations of the land to others; for that her claims “ had no standing in a court of equity or law up to the date of its confir *(569) mation, and depended on the political powers, and that if she was wronged by the sovereign power having granted the land to others, she is without remedy in a municipal court.”
In the case of the United States v. Lawton et al. 5 How. p. 28, a land claim under the treaty of 1819, the rules which govern the court in the exercise of their jurisdiction are expressed as follows:
“ And here some legal principles interpose themselves for our government, the first of which is, that the powers of the United States courts are conferred by acts of congress, and cannot extend beyond the powers conferred. Previous to the passing of the act of May 26, 1824, conferring the jurisdiction^ on the courts, to adjudge incipient titles, the political power could alone finally pass upon them, and congress uniformly did so. By that act the courts were invested with the jurisdiction that congress had previously exercised, but to an extent considerably limited. The governing rules of adjudication as prescribed are found in the second section of that act; first, “ the courts shall have full power and authority to hear and determine all questions in said cause relative to the title of the claimant; second, the locality, extent and boundaries of said claim, etc.; and by the sixth section, on a decree being had and a copy thereof being served on the surveyor general of the district, he shall survey the land decreed, for which a patent shall be issued by the president to the claimant. The “ locality, extent and boundaries the court must find before it can make an effective decree, and if these cannot be found, no decree can be made for any specific piece or parcel of land. The superior court had no power to grant land; nor had it any power to decree an equivalent for land that could not be identified; so this court has at various times held,” etc.
It is not necessary in. this case to express any opinion as to the equities which may arise from long possession under incomplete titles, or where the boundaries are sufficiently defined by description or survey, etc., and how far, and under and against what claims it might be in the power of the courts of justice to afford any protection where action lias not been taken by the political authority. Such questions can be determined when distinctly presented for review and decision.
The petition shows that the lands claimed were not surveyed before the closing of the land offices in 1835 or severed from the mass of adjacent vacant lands; and such survey having been prohibited by the constitution and not sanctioned by subsequent legislation, we are of opinion that the land claimed belongs to the public domain, and as such, can be lawfully located and surveyed under certificates for head- *(570) rights or other evidence of title recognized by the laws of the republic and state of Texas.
The view above taken of the invalidity of the claim of the petitioner'disposes of the case, and it will be unnecessary to discuss other questions presented in the argument of counsel.
It is ordered, adjudged and decreed that the judgment of the court overruling the demurrer be reversed, and the court here proceeding to render such judgment as should have been given in the court below, it is ordered, adjudged and decreed that the injunction be dissolved as to the appellant, David Murphree, and the cause dismissed as to the said appellant.