[**357**] THE SUCCESSION OF JAMES NORTON VS. THE COMMISSIONER OF THE GENERAL LAND OFFICE — Appeal from Travis County.

The boards of land commissioners appointed under the land law of 1837 had no authority to issue certificates for such augmentations as were allowed by the 17th article of the colonization law of 1825.

The jurisdiction of the board of land commissioners under the law of 1837 extended only to headright claims.

No patent can issue on any survey that was not made on the authority of a certificate returned as genuine and legal by the boards of land commissioners appointed under the act of 1840, "to detect fraudulent land certificates," etc.

Case stated in the opinion.

*Gillespie*, for appellant.

*Webb*, for appellees.

Mr. Chief Justice HEMPHILL delivered the opinion of the court.

This is an application for a writ of *mandamus* to be directed to the commissioner of the general land office, requiring him

to issue a patent on a claim to land, alleged to be due the succession of the appellant.

The claim is founded, as averred in the petition, on a concession of the date of the 5th of August, 1830, for one league of land, granted by the government of Coahuila and Texas, as an augmentation to the headright of the deceased, who was a colonist in one of the contracts of the empresario, Stephen F. Austin.

[358] The land was surveyed as is alleged, and the deceased placed in possession by the commissioner of the colony. That improvements were made on the premises and the possession was continued up to the death of the intestate; but that for reasons unknown to the petitioner, no title of possession had been issued to the deceased before the closing of the land offices in 1835, and the claim not having been recommended by the commissioners appointed under the act to "detect fraudulent land certificates," etc., the commissioner of the general land office had refused to issue a patent for the same. There is no allegation in the petition or evidence in the record that the deceased had procured a certificate from any board of commissioners appointed under the land law of 1837, but the cause having been argued by both parties as if such certificate had issued, and as the result cannot be affected by the existence or non-existence of the fact, we will consider the question as if such fact had been averred and admitted or established in the record.

The commissioner in his answer avers that he is not bound to issue the patent on the grounds that the certificate was not recommended for patent. That the plaintiff does not allege that he is the head of a family or other sufficient matter to entitle him to a certificate for a league of land as a headright, and that if the plaintiff is entitled to relief his remedy is not by *mandamus*.

The judgment of the court below was for the defendant. It appears from the petitioner's own showing that at the closing of the land offices in 1835 the title had not been perfected; and admitting, if the claim were valid in its inception, that the former government was under a political obligation to issue

what was then called a title of possession, the principal question is, whether the present government has assumed this obligation and prescribed a remedy by which it can be enforced in courts of justice.

It cannot be doubted that it depends entirely upon the national [359] will whether the government which rises upon the submersion of a former sovereignty shall or shall not recognize the obligatory character of all the arrangements made by the former government for the disposition of the territory now become the public domain of the new sovereignty. To fulfill all such obligations, to complete all claims or rights which depended for their final ratification on the pleasure of the former authorities, might paralyze the powers of the new government and defeat some of the most essential objects of the revolution, and to admit that by the laws of nations such duties are necessarily entailed upon the new government would be a doctrine fatal to the cause of political progress and reform.

We will not enter here into a discussion of the various considerations of necessity, policy and justice which would render an indiscriminate observance of the obligations of former governments in the highest degree detrimental to the welfare of the new society, destructive of its vigor and resources, embarrassing its most salutary operations, and rendering a discharge of its own obligations, by which the safety and perhaps existence of the state was secured, extremely onerous or altogether impossible.

It is sufficient for this question to state that by the organic law the operations of the land system were suspended and future surveys or titles prohibited, unless authorized by the convention of some future congress of the republic. It is not pretended that the convention afterwards removed the suspension and authorized new surveys or patents to issue on those already made, and we must resort, therefore, to subsequent legislation to ascertain whether patents have been authorized on surveys such as the claimant's.

It was contended that the boards of land commissioners appointed under the land law of 1837 were authorized to investi-

gate this claim, and that their action in its favor could not be rendered a nullity by the want of recommendation of the board of commissioners, appointed under the act [360] to detect fraudulent land certificates, their jurisdiction being, as was asserted, confined to the examination of certificates for claims to headrights only.

It appears, I think, very clearly from various provisions of the land law of 1837, that the boards appointed under that law were confined in their examinations to claims for headrights proper, and that their jurisdiction neither extended to larger claims nor to such augmentations of headrights as were founded upon the 17th article of the colonization law of March, 1825; or other claims whose requisites were not those which constituted the merits of a headright claim.

In the 11th section provision is made for the creation of a board of commissioners, and it is declared to be their "duty to investigate all *claims* on this government for *headrights* to lands; and they are hereby authorized and required to grant to any person or persons a certificate of their claim or claims upon such proof being made to them by the party or parties claiming as is herein required, setting forth in said certificate the amount of land the claimant is entitled to, upon what conditions, and the time when he, she or they emigrated to this country." This section which provides for their organization defines the extent of their jurisdiction.

There are some general expressions in the statute which if construed separately might extend their powers to other classes of claims; but considered in connection with this and other sections, they cannot be held to confer more enlarged powers than are granted in the 11th section.

The 9th section declares it to be the duty of the county surveyor "to receive and examine all field notes of surveys which have been or may be made in the said county," etc., etc., but does not contemplate that any survey shall be for more than a league and labor of land, as he is authorized to charge for the inspection of field notes for that and less quantities, but not for a greater amount of land.

The 12th section declares that no purchaser of a *headright*

shall be entitled, etc., and all orders of surveys for [**361**] *head-rights* are directed to be submitted to the examination of the land commissioners, etc.

The 13th section provides that *colonists* shall have the benefit of any colonization law as to the prices of their lands, which was in force at the date of the claimant's emigration to the country.

The 20th section, and upon which the petitioner in this case principally relies, directs patents to issue to persons holding orders of survey legally obtained previous to the closing of the land offices in one thousand eight hundred and thirty-five, and having a survey made agreeably to said order and in conformity to law in all respects, but only upon the indispensable condition of the holder procuring a certificate of some board of land commissioners that he is entitled to the quantity of land surveyed.

This certificate cannot be obtained without a submission of the order of survey to a board of land commissioners. And by the 12th section this submission is directed, but is restricted in its terms to orders of survey for headrights; and consequently it is only upon such orders that a certificate essential to a patent can be procured. Trimble v. Smithers, 1 Tex. 790; Menard v. Jones, 1 Tex. 771. We are of opinion that the board of land commissioners had no authority in law to issue the certificate which it is contended was obtained by the petitioner, and that their jurisdiction under the law of 1837 extended only to headright claims.

But if the certificate was legally issued by the land commissioners, there is in the fifth section of the act to detect fraudulent land certificates a positive prohibition against the patent being issued. The commissioner is inhibited under a penalty of not less than five hundred dollars from issuing patent upon any survey that shall not have been or may hereafter be made by authority of a certificate returned as genuine and legal, etc.

This certificate was not so returned, and consequently the [**362**] survey cannot be patented. The office of the commissioner of the general land office is created and its powers defined and duties prescribed by law. The extent or limita-

tions of its authority depend on statutory provisions; and the duties of the trust must be discharged in conformity with the powers granted and the restrictions imposed, unless they are clearly in contravention of the provisions of the constitution.

It has not been contended in this case that the 5th section of this act is unconstitutional; and we will not therefore enter into a consideration of the question.

It might be contended, and with much force, that an augmentation of a headright is a most meritorious claim, and strongly commends itself for recognition and completion, on the ground of its not being detrimental, but rather in accordance with the policy of the present government in relation to the distribution of public lands. Such consideration cannot be made the foundation of our action. They address themselves to the political department of the government, and if disregarded, whether on principles of sound and just policy or otherwise, the judicial department is without the power to afford redress.

There is no error in the refusal of the court below to issue the *mandamus;* and it is ordered, adjudged and decreed that the same be affirmed.

---

[**363**] JAMES H. HOLT vs. THE STATE — Writ of Error from Washington County.

The act of 1846, requiring the jury in certain cases to assess the amount of punishment to be inflicted, is not an *ex post facto* law in reference to offenses for which there were prosecutions pending at the period of its enactment. [6 Tex. 347; 14 Tex. 402.]

*Gillespie,* for plaintiff in error.
*Harris,* Attorney General, for defendant in error.

Mr. Justice WHEELER delivered the opinion of the court. James H. Holt was indicted for an affray at the fall term, 1844, of the Washington district court. The prosecution was pending until the fall term, 1846, when the accused was tried