DONALDSON v. DODD AND OTHERS.

The Act of the Consultation closing the Land Offices took effect immediately after its passage, on the 13th of November, 1835, and all titles issued by general or special Commissioners or Alcaldes after that date, are null and void.

Appeal from Anderson.

*Donley & Anderson* and *A. M. Burford*, for appellant. The error complained of, as set forth in appellant's bill of exceptions and assignment of errors, consists mainly in the ruling of the Court below, that the title, offered as evidence by the appellant, issued by the Commissioner George W. Smyth, to Francisco de Rojo, on the 21st day of November, A. D., 1835, had no standing in Court, because issued after the 13th of November, A. D., 1835, the date of the Acts of the Consultation.

We submit that the 14th Article of the plan and powers of the Consultation, did not, *ipso facto*, close the Land Offices then existing, nor was it so intended by the framers of the same. We may clearly draw this inference from the very wording of the Article referred to. It is not a peremptory statute, thus, all Land Commissioners and others mentioned be and they are hereby ordered, but that they be ordered. Can this language be by any possible means of construction made to imply anything else, but that there was a still further act to be done, either by the Consultation or the Governor and council about to be created? And that act was the ordering the Land Commissioners, &c., to desist their operations. The Article itself is not declaratory of what is now done, but merely directing and authorizing that which should be done by the powers created by the Consultation.

But we are not left entirely to the language of the 14th Ar-

ticle of the plan and powers, and the construction upon that portion of the Article, to ascertain the meaning and intent of the framers of the Article. For the same Article contains : " That fit and suitable persons be appointed to take charge of " all the archives belonging to the different land offices, and " deposit the same in safe places, secure from the ravages of " fire or devastation of enemies. And the said persons shall " be three from each department as Commissioners to be forth- " with appointed by this house, to carry this resolution into ef- " fect, and report thereof to the Governor and council ; that the " political Chiefs immediately cease their functions." What is here meant by the words " carry this resolution into effect ?" Does it not mean the entire resolution ? It certainly can mean nothing else, if we give to language its ordinary meaning, nor is there any rule of construction known to us that would give it a different meaning. Then we must of course conclude that the Commissioners to be forthwith appointed were appointed as much for the purpose of carrying into effect the first clause of the 14th Article, " That all Land Commissioners, " Empresarios, Surveyors or persons in any wise concerned in " the location of the land, be ordered forthwith to cease their " operations, &c," as any other portion of the provisions enumerated in said 14th Article. To conclude otherwise would be to consider the said first clause not a portion of this " resolution which they were to carry into effect." Consequently we are still led to conclude from the language of the Article 14th, that the Consultation did not consider the Act of Consultation closing the Land Office complete, until Commissioners were appointed to carry all the provisions of the Article into effect, and of course to notify or order the Land Commissioners to cease their operations. And even not then would we consider the Land Offices closed until those Commissioners had given the orders which they were commissioned to give. They knew how to declare their determination that a thing should immediately cease, in the clause referring to the political Chiefs, which is, " That the political Chiefs immedi-

" ately cease their functions;" and how very different is this declaration from that, " That they be ordered to cease their functions."

But we are not left alone to construction to ascertain the intent of the framers of the aforesaid 14th Article. However obvious their meaning may appear, from the language used, it is still, if possible, more fully and clearly shown by the appointment of Commissioners to notify the Land Commissioners, &c., to cease their operations, as the Court judicially knows, and as it is also admitted of record by the appellees. If the Consultation considered the passage and approval of the 14th Article, an entire and complete act, and that the Land Offices were thereby closed, we would then inquire what was the object and necessity of imposing upon Commissioners a duty already performed, and requiring of them labors entirely unnecersary ?

But again, the Consultation, in Article 15 of the plan and powers, clearly show that it was not their design to destroy all pre-existing regulations, in regard to the land system, by declaring " That all persons now in Texas, and performing " the duties of citizens who have not acquired their *quantum* " of land, shall be entitled to the benefit of the laws of colo- " nization under which they emigrated, &c.; and by Article " 20 making a disposition of all moneys then due or that " might afterwards become due on lands lying within the " limits of Texas." And here we might be permitted to suggest that if titles like this of De Rojo's be set aside, the new government will have received the dues on about 160 titles of a like character at a period when she most needed funds, and have expended the same in the purchase of munitions of war without reimbursing those who had paid the same.

The construction contended for by the appellees, of the 14th Article of the plan and powers of the Provisional Government connected with the clause above alluded to, of the general provisions of the Consultation, would clearly have the effect of destroying this class of titles, embracing many leagues of

land, the titles of which have been regarded by their owners for a number of years as entirely safe. But it is submitted that every presumption is against its being the intent and object of the Consultation and framers of the Constitution, thus to annul any properly acquired title. (United States v. Perchemam, 7 Peters, 51.)

That such was not the intention of the Consultation is to be gathered from Article 15, which provides as above set forth, for all persons then in Texas who should remain and perform the duties of citizens to have their *quantum* of lands. And Article 18, which declares all fraudulent grants made by the Legislature of the State of Coahuila and Texas, located or to be located, null and void, but impliedly confirms all pre-existing grants fairly obtained. And so Article 19, which provides for the forfeiture of lands by those who left the country to avoid a participation in the struggle for independence, impliedly gives to all who remain the land to which they were entitled under the pre-existing government.

Granting, then, that the Consultation did not, by the passage and approval of the 14th Article of the plan and powers of the Provisional Government, close the Land Offices and did not so intend thus to close them, but intended and designed that they should only be closed by giving the notice as above contended.

We come then to consider of the construction to be given to the clause of the 10th Section of the General Provisions of the Constitution of the Republic, which declares that all the surveys and locations of land made since the Act of the late Consultation closing the Land Offices, and all titles to land made since that time, are and shall be null and void.

In construing the word Act in the above clause, we would submit the framers of the Constitution mean nothing more here than the Consultation meant, and that the word " Act" does not refer to the 14th Article of the General Powers and Provisions as a law or statute, but refers to the deed or thing done or performed, of closing the Land Offices, which, as we

have before urged, consisted in the passage of the Article, the appointment of the Commissioners to notify the Land Commissioners, Surveyors, &c., and the giving of the notice.

To construe it otherwise, as before suggested, would be to accuse the government of committing a gross fraud upon the class of claimants under consideration. By inducing them to believe from, not only the language of the Consultation, but from the Act of appointing Commissioners to give notice, that the Land Commissioners did continue in office until notified, and thus induce them to receive their titles from officers very clearly recognized by the then new government for a time, and to pay over the dues to those officers upon their lands, which were received and appropriated by the new government to a large amount, and then afterwards to deprive them of their lands thus purchased.

Again we find that in the Land Law of December 14, 1837, (Hart. Dig. Art. 1848,) that every person who shall claim a title to land by virtue of the colonization laws, * * * * shall take and subscribe the following oath: " I do solemnly " swear that I was a resident citizen of Texas, at the date of " the Declaration of Independence; that I did not leave the " country during the campaign of the Spring of 1836 to avoid " a participation in the struggle; that I did not refuse to par- " ticipate in the war, and that I did not aid or assist the ene- " my; that I have not previously received a title to my *quan- " tum* of land."

Now, we would venture the assertion that there was not, at the passage of the above cited Act, nor at any time since, a single individual in the Republic or State of Texas, holding such a title as De Rojo's, that would have dared to have made oath that he had not received his *quantum* of land, so securely had they been taught to rest upon their titles thus issued by the language and Acts of the Consultation and the contemporaneous construction of the Articles of the Plan and Powers and of the Constitution of the Republic.

Again, in closing the Land Offices, Texas was not acting

25

Donaldson v. Dodd.

against her enemies or citizens inimical to her interests, but merely for the purpose of producing equal chances amongst her own citizens in selecting and locating land ; and hence there was no necessity for that violent and abrupt closing, that appellees urge, which would be so destructive to the best interests of many of her own citizens.

In determining upon the validity of the title issued to De Rojo by Commissioner Smyth, it is necessary to determine the question as to when the Act of the Consultation became operative, and inasmuch as the Civil Law was then in force in Texas, to the Civil Law must we look for a solution of this important question. Previous to the formation of the Constitution of the Republic of Texas it was an unannulled principle, that laws were of no binding obligation until after they were duly promulgated. (2 Tex. R. 29.) This position is fully sustained by the unanimous opinion of all writers upon the Civil Law. (1 Domat, 114.) If it be true, that under the Civil Law which was in force in Texas, at the passage of the ordinance closing the Land Offices, laws were of no binding obligation until after they were duly promulgated ; then the question arises as to the length of time necessary to elapse from the passage of a law before the same will be presumed to have been duly promulgated, for the determination of this inquiry Civil Law writers say, the presumption will be in favor of the publication after a reasonable lapse of time for its transmission from the capital. (2 Tex. R. 29.) Now we contend that from the 13th November, 1835, the date of the Act of the Consultation, to the 22nd of the same month and year, the date of the issuance of title, was not a reasonable time for the publication of an Act at Nacogdoches, adopted by the Consultation at San Felipe de Austin. As an evidence that the Acts of the Consultation were not regarded as operative until after they had been duly promulgated, the Court is referred to an ordinance making it the duty of the Governor to issue a special commission and warrant in the case of W. H. Steele, &c., &c., (Laws of the Consultation, page 43,) from

which it most clearly appears that the Consultation did not regard the 14th Article of the Organic Law as binding until Steele and the other Commissioners had been notified to cease their functions as Commissioners to issue titles.

*G. F. Moore*, for appellee. (The appellee's brief is omitted because of its length.)

Hemphill, Ch. J. The only question in this case is, whether a Commissioner at Nacogdoches, acting under a commission from the Executive of the State of Coahuila and Texas, had, on the 21st day of November, 1835, authority to issue titles to lands. The title of the appellant was issued on that day; and as it is unobjectionable in other respects, it must be deemed valid, provided the authority of the Commissioner still continued in force. The solution of this question depends upon the time at which the Act of the Consultation closing the Land Offices, took effect, whether immediately or only after promulgation and due notice of the adoption of the Act. The organic provision was ordained on the 13th November, 1835, and if its operation was immediate, the title of appellant is a nullity; if not, its validity depends upon the time at which the notice was or might have been received by the officer issuing the title. The point seems too clear for dispute, but, as it has been argued most zealously, ably and elaborately, it will receive such attention as can, under the pressure of other causes be allowed to its consideration.

The fourteenth Article of the Plan and Powers of the Provisional Government provides, "that all Land Commissioners, "Empresarios, Surveyors, or persons in any wise concerned "in the location of land, be ordered forthwith to cease their "operations during the agitated and unsettled state of the "country, and continue to desist from further locations until "the Land Offices can be properly systematized," &c. The Article further provides "that suitable persons be appointed

" to take charge of the archives in said offices and deposit
" them in safe places," &c.

It is contended by the appellant, that this Act does not contemplate an immediate *cesser* of the operations of the Land Offices, but that this was to depend on a future event, viz: an order to be issued for that purpose. The phraseology is somewhat peculiar, and, when taken alone, might possibly admit of two constructions. But when we consider that this was but one of many provisions of an organic law by which in a time of revolution a government was to be organized and put into operation; that no part of such law was submitted or intended to be submitted to the people; that the exigence of the times required the prompt adoption and immediate enforcement of this fundamental Act; and especially, that it was very important to individuals absent in the army, and to government for financial purposes, that no further abstractions from the public domain should be permitted, and the reason for such act, viz: "the agitated and unsettled state of the country," being as cogent at the date of the Act as it could be in the future, we must come to the conclusion that the operation of the Article was intended to be immediate, to be general and uniform, and not in the future or variant or fluctuating, dependent upon the distance of the Empresario or Commissioner from the seat of Government, and the respective times in which it was or might have been promulgated or made known respectively to the various officers and other persons concerned in the location, survey or passing titles to lands. This interpretation would comport with and sustain the policy and object of the law, whereas, by the other, it would be seriously impaired, and in a great measure defeated.

The supreme authority was expressing their will that land operations should not be continued, and whether they phrased it that they should forthwith cease or be ordered forthwith to cease was immaterial. These phrases, at least under the circumstances, must be considered as equivalent to each other. The difference between them is a matter of style and not of

substance; at most, the language cannot be taken to mean more than that the operations shall cease forthwith and the officers shall be notified to that effect, and not that a Surveyor or person concerned in the location of lands, although buried in the depth of the woods, may lawfully continue his operations until hunted up and informed of the suspensive clause of the organic law.

But if it were admitted that these views are erroneous, and that the appellant is right in his construction, yet this would not operate any substantial benefit to him or sustain his title. The Constitution presents against it an obstacle more formidable, if possible, than that which exists in the Act of the Consultation. By the Constitution it is declared, that, "whereas "many surveys and titles to lands have been made while most "of the people of Texas were absent from home serving in "the campaign against Bexar, all the surveys and locations of "lands made since the Act of the late Consultation, closing "the Land Offices, and all titles to land made since that time, "are and shall be null and void." Here is an emphatic declaration, annulling all locations and surveys made since the Act of the Consultation, and all titles to lands made since that time. What time is here spoken of? That of the Act of the Consultation, not the time when it went into operation, but the time of Act itself.

It is immaterial when it legally went into operation, whether immediately or on notice to the officer, or whether it never went into operation as against the acts of those who had no notice—the acts of all, from the time of the law, are equally and alike made null and void.

There can be no doubt of the power of the Convention to destroy even valid titles, and in this view an inquiry into the true meaning of the Act of the Consultation becomes immaterial. The only point to be ascertained is the date of the Act closing the Land Offices. That being fixed, the Constitution annihilates and extinguishes all subsequent operations in locating, surveying or making titles to the public lands.

It is contended, but we think on no plausible grounds, that the terms in the Constitution "since the Act" do not mean since the date of the Act, but since the respective times at which the Act took effect, that is to say, from the dates respectively at which the several officers or others employed in the land business or Offices received notice of the passage of the Act. The literal import of the terms, as well as the spirit and policy of the provision, repel any such construction. In fact the terms are too plain to admit of interpretation. They are too positive and precise to allow a doubt of their meaning, or to give any loop on which to hang the construction contended for by appellant. The intention was manifestly to annul all acts and titles, from a particular date, and not some from one date and some from another, and even to permit others to stand on the ground that they may have emanated from some Special Commissioner, with his authority in his pocket, and who consequently may not have been expressly notified of the Act. Were the terms less explicit than they are, yet the appellant's construction would be inadmissible on the ground of its palpable repugnancy to the object and purpose of the Convention. The design was to benefit those who had been serving in the public campaign against Bexar, and who were said, in the Constitution, to be most of the people of Texas, and to prevent those who, from reasons sufficient or insufficient, had chosen to remain at home, from absorbing the best portions of the public lands. This object would have been defeated, if the land operations had been permitted to continue through the whole period of the campaign. This had opened some time before the Act of the Consultation. Persons in service had, before the Act, suffered disadvantage by their absence from home, and they would have been the victims of the most gross injustice, had the Land Offices not been closed, and they thus allowed some chance of making fair and equal selections from the public lands. But would not this promise of benefit from the close of the Land Offices have been but a sound, a mere delusion, if they had not all been closed at the time of

the Act, instead of some being closed immediately, and others open even until after the termination of the very campaign, the existence of which, by the Constitution is declared to be the moving cause of closing the Land Offices. The Constitution declares, that because there was a campaign, the Land Offices should be closed. The construction contended for by appellant is, that some of the offices should be kept open during the campaign, and then closed, and thus effectually exclude the soldier from the chances which the citizens had been making the best use of during his absence. That this would be the effect of the construction in relation to all the territory within the jurisdiction of the different Land Offices at Nacogdoches is evident from a moment's consideration.

The Commissioner at that place, who issued this title, did not, as appears from the evidence, receive a formal notification of the Act until the 19th December, 1835. History informs us that this was but a few days after the close of the campaign against Bexar, leaving barely time for persons from Nacogdoches to return to their homes. So that the office would be, under the Constitution, open only when the absent soldier could derive no advantage from its being open, but closed immediately on his return, thus depriving him not only of the chance of getting any of the best lands, (for these would be taken by those who remained at home during the months of his absence,) but even of getting any of the refused lands, rejected by those who had every chance of culling and selecting the best.

The relief to those serving, intended by the Constitution, would, under this construction, be a mere delusion, at least to those from the eastern frontier. The inequality of its operation would be one of its most odious features. To the soldier of middle Texas, it would give the full relief imported by its terms; while to those of the East it would give comparatively none. Land operations in the former would be suspended, but would continue in the latter long enough to abstract the best portions of the public domain, but not long enough to

give those who had been absent on service a chance of procuring any kind of lands. But it is useless to prolong this discussion about terms, the meaning of which it is impossible to doubt, and which have always been understood in but one way by the people, by the profession so far as I am informed, and it is believed by the officers concerned in the administration of the laws in relation to the public domain. This construction has been sanctioned by this Court, in perhaps more instances than one, certainly in Jones v. Menard, 1 Tex. R. 789. Any other construction is in fact too preposterous, too absurd, too unequal and unjust in its consequences, to be for a moment received with any kind of toleration. If taken according to its received construction, all doubt in relation to the validity or invalidity of titles affected by the Act, is dissipated. All, issued after the 13th November, 1835, are invalid. But if the opposite construction be allowed, then all would be confusion and uncertainty. The validity of title would depend on the possible or actual time at which notice was or might have been received at the respective Land Offices. It might be contended and with great plausibility, that the Land Offices should have been closed at Nacogdoches before the 19th December; but if so, what time should be fixed as the ultimate period for the ceasing of operations? These difficulties would be incident not only to operations at Nacogdoches, but to those elsewhere, and would add to the embarrassments under which titles to land have been oppressed.

Under the construction contended for by appellant, the condition of a Surveyor would be extremely critical and dangerous. He must swear that his survey was prior to the closing of the Land Offices by the Consultation, or subsequent to its being opened under the Act of 1837. Now, if there be a fixed time for the close of the Land Offices, he can swear to the truth and avoid the crime of perjury; if not, he does not know certainly when the Office was closed, and is consequently in great danger of swearing falsely. Surveyors have always, however, taken their oath, on the supposition that the

Land Offices were closed on the 13th November, 1835. Such has always been the opinion in the General Land Office. The officers there, it is believed, have regarded titles issuing after the 13th November, 1835, as nullities, and have not hesitated to regrant the lands to others, or to issue new titles to the original claimant on his applying a certificate to the survey.

There are several points which, in justice to the elaborate arguments that have been submitted, might, with great propriety, be discussed. But most of the authorities to which reference has been made, (even the journals of the General Council,) are inaccessible at this branch of the Court; and under the circumstances, especially in relation to a point about which there neither is nor ever has in the opinion of this Court been any doubt, there would be very little advantage in prolonging the investigation, or endeavoring to make that clear which is intrinsically beyond dispute.

The rule of Spanish jurisprudence, that a law has no force until promulgation, is admitted; as a general principle it is admirable, not less for the wisdom of its conception, than it is for the beneficence of its operation. But it is believed never to have been of any practical force in Texas, since the incipiency of her separate legislation. No modes of publication similar or equivalent to those in use under Spanish and Mexican rule have ever been adopted. Under the former governments, laws, orders and decrees were immediately communicated from the highest, through every grade successively to the lowest authorities, and prompt measures, and those presumed to be effectual, were enforced, by proclamation, by posting up at public places, by beat of drum, &c., to communicate information of the laws to the people. No such measures have ever been used by Texas in her separate capacity. Laws are published in the newspapers and pamphlets, and no efforts are made by the government to diffuse them immediately through the community. The general principle of American law, that laws are in force from their date, (1 Kent, 454,) was always recognized in Texas, until it was modified by statute

in 1840, and of course, under this principle, the Act of the Consultation did not depend, for its force or operation, on its promulgation. But it is believed that the general rule of Spanish jurisprudence is not without its exceptions, and that there may be laws which from their subject matter, or from special provision, became of immediate force. If so, no law, from its subject matter or object, could present stronger grounds for instantaneous effect, than could the organic law of the Consultation.

The counsel for the appellee contends, and with much force, that all organic laws go into operation immediately, (if not expressly or by implication otherwise provided,) and he cites instances of treaties between States (acknowledging the general rule in relation to the necessity of promulgation) which were in force from date of their signature long before their ratification; (United States v. Reynes, 9 How. 149; Davis v. The Police Jury of Concordia, Id. 280;) and that under the treaty between Spain and France, ceding Louisiana to the latter, all grants made by Spanish officers after the the date of the treaty, though long before they had any knowledge of its existence, were null and void.

<div align="right">Judgment affirmed.</div>