## T. H. MASTIN & CO. et al. v. KIRBY LUMBER CO.

### MEACHUM v. MASTERSON et al.
### SAME v. RYE et al.
### No. 609.

District Court, S. D. Texas, Houston Division.
April 29, 1936.

Andrews, Kelley, Kurth & Campbell, E. J. Fountain, Jr., and Daffan Gilmer, all of Houston, Tex., for receiver of Kirby Lumber Co.

Grover C. Lowe, of Woodville, Tex., J. H. Jackson and Alex F. Smith, both of Shreveport, La., R. H. Jones, of Livingston, Tex., and Roy L. Arterbury, of Houston, Tex., for T. G. Masterson et al. and John Rye, Jr., et al.

KENNERLY, District Judge.

By supplemental and ancillary bill in the nature of an original bill in this receivership cause, the receiver of Kirby Lumber Company (for brevity called receiver), in intervention No. 331, sues T. G. Masterson et al., and in intervention No. 354, sues John Rye, Jr., et al. (for brevity called defendants), to recover title and possession of 181.5 acres of land in Polk county, Tex., in this district and division, claimed to be part of the receivership properties. The cases, after having been brought to issue, went to a master for hearing and report, and were there consolidated, and the master has reported in favor of defendants. The receiver has filed exceptions to the report. This is a hearing on the exceptions.

1. This being an ancillary and supplemental bill in the nature of an original bill by the receiver against persons claiming adversely property in the hands of the receiver, there is jurisdiction here. Riehle v. Margolies, 279 U.S. 218, 220, 49 S.Ct. 310, 73 L.Ed. 669, 671; White v. Ewing, 159 U.S. 36, 15 S.Ct. 1018, 40 L.Ed. 67; In re Tyler, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689; Wabash Rail-

road Co. v. Adelbert College, 208 U.S. 38, 28 S.Ct. 182, 52 L.Ed. 379; Central Union Trust Co. v. Anderson County, 268 U.S. 93, 45 S.Ct. 427, 69 L.Ed. 862; Porter v. Sabin, 149 U.S. 473, 13 S.Ct. 1008, 37 L.Ed. 815; Barton v. Barbour, 104 U.S. 126, 26 L.Ed. 672; Bien v. Robinson, 208 U.S. 423, 28 S.Ct. 379, 52 L.Ed. 556; Jenkins v. Dillingham (C.C.A.) 175 F. 1021, certiorari denied 220 U.S. 620, 31 S.Ct. 723, 55 L.Ed. 613; Keith Lumber Co. v. Houston Oil Company (C.C.A.) 257 F. 1, 4, certiorari denied 250 U.S. 666, 40 S.Ct. 13, 63 L.Ed. 1197; Gordon v. Dillingham (C.C.A.) 158 F. 1019; Hollander v. Heaslip (C.C.A.) 222 F. 808, 811; Knox & Lewis v. Atwood (D.C.) 228 F. 753; Hume v. City of New York (C.C.A.) 255 F. 488; Gunby v. Armstrong (C.C.A.) 133 F. 417, 427; Bottom v. National Railway Association (C.C.) 123 F. 744; Peck v. Elliott (C.C.A.) 79 F. 10, 38 L.R.A. 616; Ross-Meehan Brake-Shoe Co. v. Iron Co. (C.C.) 72 F. 957; Cherry v. Insull Company (D.C.) 58 F.(2d) 1022; Green-Boots Construction Co. v. Hays (C.C.A.) 56 F.(2d) 829; Kreitmeyer v. Baldwin Drainage Dist. (D.C.) 2 F. Supp. 208; Samuel v. Houston Oil Co. (Tex.Civ.App.) 193 S.W. 246 (Writ of Error refused).

2. The receiver claims the land in question under an award (preliminary to patent) made *May 16, 1911*, to C. C. McDonald by the state of Texas. The defendants claim same under an alleged grant, dated *November 13, 1835*, by the Mexican government (Coahuila and Texas) to Manuel Procella. The following are the facts as found by the master:

"(a) These interventions were brought by the Receiver of the Kirby Lumber Company for title and possession of 181.5 acres of land known as Survey No. 105, Certificate S. F. 7800, T. F. Pinckney grantee, in Polk County, Texas.

"(b) On November 2, 1835, Manuel Procella petitioned the Land Commissioner for one league of land, reciting that he was a citizen and was entitled to such grant under the facts he set forth. The Commissioner referred the petition to surveyor on November 2, 1835, and the survey was made and the field notes returned to Nacogdoches on November 12, 1835, and the title grant was executed by the Commissioner on November 13, 1835.

"(c) The grant covered one league of land in Polk County, and the grant was translated and certified as a correct translation of the original title on file in the General Land Office at Austin, Texas, under date of September 24, 1854, and then filed for record in the Deed Records of Polk County, Texas, on July 20, 1859.

"(d) The parties agree that the major portion of the Procella League conflicts with a senior grant to Andreas Morales; the part that is not in conflict being 330 varas, more or less, in width, and constituting a strip running along the west line of the Morales Survey.

"(e) On July 15, 1857, a deed dated May 28, 1853, was recorded in the Deed Records of Polk County, Texas. The grantors were Philip, Jose Maria, Encornacio, Manuel, Jesus, Antonio and Martha Ann Procella; the deed reciting that they were all of mature age, the legal heirs, and all of the surviving heirs of their deceased father, Manuel Procella. The deed conveyed 4428 acres of land, being the same land granted to Manuel Procella and titled to him on November 13, 1835. The grantees were Simon De Soto, of De Soto Parish, Louisiana, and James Ferguson, of Cherokee County, Texas.

"(f) By deed dated July 28, 1859, and recorded the same day in the Deed Records of Polk County, Texas, James Ferguson conveyed his half interest of 2214 acres of land in the Manuel Procella League to J. F. C. Pitts.

"(g) On November 16, 1889, John F. C. Pitts deeded his undivided one-half interest in the Manuel Procella League to Morgan Rye, reciting that the deed was in substitution of a lost deed between the same parties, executed in 1869. The deed was a general warranty, and was filed for record on November 28, 1889, in the Deed Records of Polk County, Texas.

"(h) I find that The State of Texas, on October 24, 1885, commenced escheat proceedings in the District Court of Polk County, Texas, against all persons interested in the estate of M. Procella, deceased. The petition was filed by the District Attorney and alleged that Manuel Procella departed this life intestate on or about January 1, 1850, and at the time of his death he was seized in fee simple of the real estate thereinafter described. The petition further alleged that Manuel Procella left no heirs surviving him, made no demise of the land, that no will was ever recorded or probated in Polk Coun-

ty, and that no lawful claim had been asserted, or lawful act of ownership exercised in said land for more than twenty years next before the filing of the petition. The description of the land covered the Manuel Procella League. Citation was published for all persons interested in the estate of Manuel Procella, deceased, and the return showed that it was published for four consecutive weeks in a newspaper published in Polk County, Texas.

"(i) On July 7, 1887, a decree was entered in the said cause by default, the recital appearing in the decree that the defendants, although cited, came not and wholly made default by failing to file an answer or appear in any manner and defend the suit. It was therefore considered by the Court that the plaintiff, The State of Texas, have and recover of the defendant the described land. There is no record that any proof was introduced in the case by the State, nor was any attorney appointed to represent the persons cited by publication. The Court fixed the value of the land to be sold under the escheat proceedings at $2.00 per acre, but, after advertising, the Sheriff returned the writ without sale because no bid was made.

"(j) An application for the survey of unappropriated land was made on December 1, 1906, by T. F. Pinckney, the land being stated as bound on the north by the Mary Thomas League, on the east by the Andrew Morales League, on the south by a 503 acre survey for T. F. Pinckney, and on the west by the Seth Batson Survey. The survey was made by the Polk County surveyor, and described 181.5 acres of land lying just west of the northern part of the Andrew Morales League. The field notes were filed in the General Land Office on December 22, 1906. The Pinckney application was apparently cancelled, and on May 4, 1911, C. C. McDonald made an application for the purchase of the 181.5 acres of land. The application was at the rate of $1.00 an acre for the land, and $1.00 an acre for the timber. This was filed in the General Land Office on May 11, 1911, and the award was made on May 16, 1911. McDonald paid the $181.50 for the timber in full, and 1/40, to-wit: $4.54, on the purchase price of the land. The Kirby Lumber Company is the successor in interest of C. C. McDonald, and I find that the interest and annual payments have

been made to the General Land Office each year since 1911.

"(k) The map of Polk County of 1863, recorded in the General Land Office in January, 1865, shows the Manuel Procella League as conflicting with the Andreas Morales League, except for the narrow strip along the western side of the Morales League. On August 15, 1908, E. Von Rosenberg, an employe of the General Land Office, noted on the back of the Pinckney file that it was in conflict about 330 varas on the east line for the entire length with the Manuel Procella title league which was not covered by the Andreas Morales title league, and that otherwise it was correct on the map of Polk County. On August 29, 1908, Mr. Crain, one of the legal examiners in the Land Office, noted on the file that the Land Office was closed on November 13, 1835, and all titles issued on and after said date were void, that the Manuel Procella grant issued November 13, 1835, and hence was void.

"(l) Some of the defendants in these interventions are descendants and heirs of Morgan Rye, and others are descendants and heirs of Simon De Soto.

"(m) There was no evidence of physical possession of the land by any of the parties.

"(n) The Receiver showed payment of taxes on the property by the Kirby Lumber Company and its predecessor in title from 1913 to 1934, inclusive. There was no evidence as to payment or non-payment of taxes by any of the defendants or their predecessors."

3. If, as claimed by the receiver, the Procella grant, under which defendants claim, is void, the receiver is entitled to recover. The first question, therefore, is as to the validity of that grant.

It is settled in Texas that the act passed by the Consultation of the Chosen Delegates of all Texas in General Convention Assembled, which met in San Felipe, Tex., October 16, 1835 (usually referred to as the Consultation), which closed the land offices stopping the granting of land, *was effective from and after its passage,* and that grants made *subsequent* to its passage are void.

The act closing the land offices is article 14 of the ordinance establishing the provisional government of Texas (Gam-

mel's Laws, vol. 1, pp. 541 and 542), and is as follows (italics mine):

"Article XIV. That all land commissioners, empresarios, surveyors, or persons in anywise concerned in the location of lands, be ordered *forthwith* to cease their operation during the agitated and unsettled state of the country, and continue to desist from further locations until the land office can be properly systematized by the proper authority, which may hereafter be established; that fit and suitable persons be appointed to take charge of all the archives belonging to the different land offices, and deposit the same in safe places, secure from the ravages of fire, or the devastation of enemies; and that the persons so appointed be fully authorized to carry the same into effect, and be required to take and sign triplicate schedules of all the books, papers, and documents found in the several land offices, one of which shall be given to the governor and council, one left in the hands of the land officer of the land office, the other to be retained by the said person; and they are enjoined to hold the said papers and documents in safe custody, subject only to the order of the provisional government, or such competent authority as may be hereafter created; and the said persons shall be three from each department, as commissioners, to be forthwith appointed by this house to carry this resolution into full effect, and report thereof to the government and council (and that the said political chiefs immediately cease their functions). The different archives of the different primary judges, alcaldes, and other municipal officers of the various jurisdictions shall be handed over to their successors in office, immediately after their election or appointment; and the archives of the several political chiefs of the departments of Nacogdoches, Brazos, and Bexar, shall be transmitted forthwith to the governor and council for their disposition."

The cases are: Houston v. Robertson's Adm'r (1847) 2 Tex. 1; Trimble v. Smithers' Adm'r (1846) 1 Tex. 790; Jones v. Menard (1846) 1 Tex. 771; Rivers v. Foote (1854) 11 Tex. 662; Donaldson v. Dodd (1854) 12 Tex. 381; Houston v. Blythe (1883) 60 Tex. 506; Parker v. Bains (1883) 59 Tex. 15; Edgar v. Galveston City Co. (1858) 21 Tex. 302; Williams v. League (Tex.Civ.App. 1898) 44 S.W. 570.

See, also, section 10 of the General Provisions of the Constitution of the Republic of Texas.

The cases cited are with respect to grants dated *after* November 13, 1835. The case here is with respect to a grant dated *on* November 13, 1835. So far as I have been able to find, the identical question presented here has not been decided by any Texas court. The master's conclusion on the question is as follows: "From the foregoing facts, I conclude that the Manuel Procella League, except where it conflicts with the Andreas Morales League of land not involved in this suit, is a valid grant. The act of the Consultation closing the Land Office was ordained on November 13, 1835, and was enrolled and signed by the delegates after 6:00 P. M. (Gammel's Laws, vol. 1, pages 538, 541). Land titles issued before that date by the proper authorities were valid and all issued after that date were null and void. (Constitution of Texas 1836, General Provisions, § 10; Donaldson v. Dodd, 12 Tex. 381, 392.) In the absence of proof to the contrary, the law presumes that the Land Commissioner complied with the law and acted at a time when he might do so legally. The only proof here is that the grant was issued on November 13, 1835, and I, therefore, conclude that it was issued at a legal time and that the grant is valid."

I do not agree with him.

The Consultation convened at San Felipe de Austin *October 16, 1835,* and adjourned to *November 1, 1835.* Upon convening *November 1, 1835,* officers were elected and business actively taken up. A suggestion on the first day in the address of Mr. Archer, elected president, is significant (Gammel's Laws, vol. 1, p. 511): "Some fraudulent sales or grants of land, by the late government of Coahuila and Texas, will require your attention."

Also on the first day, the Consultation had before it a report from R. R. Royal, president of the General Council of Texas, in which it is said (Gammel's Laws, vol. 1, p. 513): "On the twenty-seventh the council passed a resolution, requiring the suspension of the proceedings of the various land offices, for reasons therein stated, which will be found on file marked N, copies of which have been ordered to be served on all the land commissioners."

The question of closing the land offices and suspending the issue of land titles was thus early before the Consultation.

After, on *November 4, 1835*, having adopted rules of procedure (Gammel's Laws, vol. 1, p. 515), and on *November 7, 1835*, having adopted a declaration, setting forth the reasons of the Texans for taking up arms against the government which Santa Anna was seeking to set up, the Consultation on that · same date appointed a committee of twelve to draw up and submit a plan or system of a provisional government for all Texas (Gammel's Laws, vol. 1, p. 523). On *November 9, 1835*, the work of this committee of twelve having been intrusted to two subcommittees, one subcommittee reported a plan for the civil department of the government and the other for the military department. There apparently was much discussion of the reports, and they were finally referred to a committee of five (Gammel's Laws, vol. 1, p. 527). On *November 10, 1835*, the plan of both the civil and military departments again came before the Consultation on a report of the committee of five, was referred to a committee of the whole, was adopted and reported back to the Consultation, and was on the next day *(November 11, 1835)* taken up section by section for discussion and vote. Articles 1 to 13 of the Plan of the Civil Department were read and adopted. The provisions respecting the closing of the land offices was article 14 of the Plan of the Civil Department. It was divided so that the vote could be taken on each clause separately. The first clause, relating to ′the closing of the land offices, was adopted at the afternoon meeting of *November · 11, 1835*. During the same afternoon, the latter clause was adopted (Gammel's Laws, vol. 1, p. 530). Thereupon, Mr. Sam Houston moved that article 14 of the Civil Department be so amended (Gammel's Laws, vol. 1, p. 531) "as to require the commissioners to be appointed under that section, to demand and take in charge all public documents, particularly those in the hands of the political chief of the department of Nacogdoches; and that the said political chief cease his functions immediately."

The amendment was concurred in.

Later during the same afternoon, articles 15, 16, 17, 18, and 19 were adopted, and the report of the committee as to the military department was taken up, read article by article, and adopted (Gammel's Laws, vol. 1, pp. 530, 532).

Article 1 of the Civil Department Plan is as follows (Gammel's Laws, vol. 1, p. 538): "That there shall be and there is hereby created, a provisional government for Texas; which shall consist of a governor, a lieutenant governor and a council, to be ·elected from this body; one member from each municipality, by the majority of each separate delegation present, and the governor and lieutenant governor shall be elected by this body."

Articles 2 and 3 of the Military Department Plan are as follows (Gammel's Laws, vol. 1, p. 543): .

"Art. 2. The regular army of Texas shall consist of one major general, who shall be commander in chief of all the forces called into public service during the war. ·

"Art. 3. The commander-in-chief of the regular army of Texas· shall be appointed by the convention and commissioned by the governor."

On *November 12, 1835,* at the morning session, the Consultation proceeded to elect Henry Smith, Governor, J. W. Robinson, Lieutenant Governor, and Sam Houston, Major General of the Army of the Provisional Government. And at the afternoon session, which convened at 2:30 p. m., members of the General Council were elected, all the officers took the oath of office, and the Consultation adjourned for fifteen minutes to allow the Council of the Provisional Government to organize (Gammel's Laws, vol. 1, pp. 533, 534).

It is clear, therefore, that the Consultation regarded the articles establishing the provisional government as in force on *November 12, 1835.* ·Sam Houston was in command at the Battle of San Jacinto (April 21, 1836) under this appointment.

On *November 12, 1835,* at the morning session, Mr. Perry had proposed a substitute for that clause of article 14 of· the Civil Department Plan relating to land offices, which was laid on the table until 2 p. m. the same day. At the afternoon session, his amendment was rejected, an amendment by Mr. Barrett adopted, and an amendment by Mr. Smith was rejected. Thereupon, just before adjournment of the afternoon session, the following proceedings were had (Gammel's Laws, vol. 1, p. 535):

"The following persons were appointed commissioners under the fourteenth section, to take in charge, examine and safely keep the papers and documents relating to the land offices:

"Department of Brazos, Messrs. Mitchell, Wharton, Dyer.

"Department of Nacogdoches, Messrs. A. E. C. Johnson, S. H. Everitt, J. Leplesser."

These commissioners were appointed in accordance with the provisions of article 14, just as the President, Vice President, members of the council, and the Major General (Sam Houston) had earlier in the day been appointed. It is clear that the Consultation regarded the action on article 14 as final and effective on *November 12, 1835,* and regarded the land offices as having been closed, and as provided in such article, appointed the commissioners to take charge of the land office papers.

At the session of the Consultation next day *(November 13, 1835),* which convened at 8 a. m., Mr. Barrett, chairman of a committee appointed to consider several matters pertaining to the Army, made a written report to the Consultation, in which he in part uses the following language (italics mine) (Gammel's Laws, vol. 1, pp. 536, 537): "Your committee, before closing their report, would respectfully call the attention of this house to the army now in the field. This force is composed of volunteers from every rank of citizens in the country, whose services generally commenced before the assembling of this house, and as their movements have hitherto been regulated by officers of their own choice, no obligation can be imposed upon them to submit to the control of the provisional government; advisory communications are all that can be made to them, nevertheless, your committee recommends that every honorable inducement should be held out for their continuance in their country's service, at any rate until a regular army be ready to take the field, and should Bexar so long hold out against their efforts. *Already have this house passed resolutions for their individual compensation, when the resources of the country will permit. The land offices have been closed, that no advantage should be taken over the soldier in the field in making his selection of lands;* the gratitude of this body, as the representatives of the people of all Texas, has been twice ex-

pressed and entered upon the journals of the house, and every effort used to afford supplies of ammunition and provisions within the power of the late council, and of this body; these efforts we recommend to be continued, and that this house recommend the members of the army to elect such officers as are wanting, and that all the officers report themselves to the governor and council for commissions; that their respective ranks be known of record for purposes obviously necessary for their future compensation, and that of the soldiers under them, who may receive discharges from their respective officers, that they may be fully known when a grateful country shall be able to express her thanks in bounties more substantial than mere words."

This report was unanimously adopted, and at this same morning session of November 13, 1835, Robert Peebles was elected as one of the commissioners under article 14, in place of John A. Wharton.

In the light of these proceedings, the wording of the following portion of section 10 of the General Provisions of the Constitution of the Republic of Texas, adopted in 1836, is significant (italics mine): "And whereas many surveys and titles to lands have been made whilst most of the people of Texas were absent from home, serving in the campaign against Bexar, it is hereby declared that all the surveys and locations of land made *since the act of the late consultation closing the land offices,* and all titles to land made since that time, are, and shall be null and void."

I think it must be held that the act of the Consultation closing the land offices took effect with the passing and adoption of article 14, and not later than the adjournment of its afternoon session of *November 12, 1835,* and that the purported grant to Procella having been dated and signed November 13, 1835, was and is void.

And this is true notwithstanding the proceedings at the sessions of the Consultation on the morning and evening of November 13, 1835, as follows (Gammel's Laws, vol. 1, p. 538):

"On motion of Mr. S. Houston, the house took up the ordinances establishing a provisional government for Texas; whereupon, after several amendments were made, it was, on motion of Mr. Macomb, adopted.

"On motion, Messrs. Barrett, Kellogg and Allen, were appointed a committee of enrollment, and were permitted to retire with the secretary to enroll the ordinance, just adopted by this convention.

"On motion, the house adjourned to six o'clock this evening, to obtain the signatures of the members to the ordinance just past establishing a provisional government; also to receive and sign the declaration, prepared on a resolution from this house, passed the eleventh instant, respecting the 'Cherokee Indians and their associate bands.'

"Six O'Clock, P. M.

"The house met pursuant to adjournment.

"On motion, the members were called to sign the ordinance 'establishing a provisional government' by municipalities."

These proceedings on November 13, 1835, must be considered and construed in connection with the prior proceedings herein discussed, and when so considered and construed, it is clear they had no effect on the previous action of the Consultation adopting article 14 closing the land offices, and proceeding thereunder by appointing the commissioners provided for therein to take charge of the records.

■ But if the proceedings on November 13, 1835, are given controlling effect as against such prior proceedings, the ordinance of which article 14 is a part is shown to have been adopted soon after 8 a. m. on that date, and if not effective sooner, was effective at that hour, and not at 6 p. m. after it was enrolled and signed by the members present. There is nothing in the rules adopted by the Consultation, and under which it was working (Gammel's Laws, vol. 1, pp. 515–518), which required the enrollment of a measure or its signature by the members before it became effective. The rules appear to be to the contrary.

4. But whether the act of the Consultation closing the land offices (article 14) became effective, as I have concluded, not later than the adjournment of the Consultation on the afternoon of November 12, 1835, or as the master concluded, at 6 p. m. on November 13, 1835, or at the time the ordinance, of which article 14 is a part, was as a whole taken up and adopted soon after 8 o'clock on the morning of November 13, 1835, the next question is: At what hour on November 13, 1835, did the Mexican commissioner sign the purported Procella grant. If he signed it at any time after the land offices were closed, it is void. The Texas cases are emphatic on this point. Manifestly after the lapse of more than one hundred years, it is impossible to produce before the court any person knowing the facts, so that the actions of the interested persons at and after November 13, 1835, must be examined.

■ It is a matter of history in Texas, and is abundantly reflected by the proceedings of the Consultation, that not only were the people of Texas concerned in preserving the public lands to compensate the soldiers engaged in the conflict to obtain freedom for Texas, but there were many fraudulent grants being made by commissioners appointed by the Mexican government, and presumption respecting the validity of such grants should not be carried too far. Circumstances may be found sufficient to refute them.

Soon after the adoption of the Constitution of the republic, a land office was created, and is still in existence, where substantially all the records, both valid and invalid, of these various commissioners were later lodged and have since been preserved. While the records pertaining to the Procella grant are in the land office, and it is shown on certain of the land office maps of Polk county, it is shown to be in conflict (except as to a small tract including the land involved in this suit) with the Andreas Morales, an older grant. In 1880, the State Abstract Book, issued by the land office, showed the Procella grant to have been abandoned. In 1906, when the field notes of the survey under which the receiver claims were filed in the land office, a draftsman in the land office made the following indorsement thereon: "Not disclosed by the official map, all of vacancy. It appears to conflict about 330 varas on the east line the entire length of this with Manuel Procela title league that is not covered by the Andreas Morales T. League otherwise covered on map of Polk County, August 15/08."

Later in 1908, the legal examiner of the land office made the following indorsement on the file or wrapper covering such survey: "Land Office closed November 13, 1835, and all titles, issued on and after

said date, void—Manuel Procela Grant issued November 13/35—hence void." Dated, "8/29/08." Signed, "Crain."

■ The land commissioner in 1908 declared the survey to be vacant land, and later sold it to C. C. McDonald, under whom the receiver claims. While the action of the land commissioner and his assistants is not conclusive against defendants, such action will be given much weight by the courts. Houston Oil Co. v. Hayden, 104 Tex. 175, 178, 135 S.W. 1149; State v. Gunter, 36 Tex.Civ.App. 381, 81 S.W. 1028; McGee v. Corbin, 96 Tex. 35, 36, 70 S.W. 79; Schendell v. Rogan, 94 Tex. 585, 594, 63 S.W. 1001; Tolleson v. Rogan, 96 Tex. 424, 428, 73 S.W. 520.

There is no evidence here of any protest against this action by the commissioner by any one connected with the Procella title.

There is no evidence of any occupancy of the land by any one claiming under the Procella title, nor is there evidence of any rendition or payment of taxes by them. The only evidence of any claim under Procella over a period of more than one hundred years is a chain of title of four or five deeds on the records of Polk county, beginning in 1853 and ending in 1889, under which defendants claim. This chain begins in persons who purported to be heirs of Procella, but there is no evidence in this record that they were, except certain recitations in one or more of the deeds.

The receiver's chain of title, beginning with the purchase from the state by C. C. McDonald in 1908, is active, showing claim, rendition, and payment of taxes, etc.

■ It has long been the law in Texas, as in many other states, that facts will be presumed in support of an active title, but not in support of a dormant or inactive one, such as is the Procella title. Fletcher v. Fuller, 120 U.S. 534, 551, 7 S.Ct. 667, 30 L.Ed. 759; Hanner v. Moulton, 138 U.S. 486, 495, 11 S.Ct. 408, 34 L.Ed. 1032; Underwood v. Dugan, 139 U.S. 380, 382, 11 S.Ct. 618, 35 L.Ed. 197; Wetzel v. Minnesota R. Transfer Co., 169 U.S. 237, 241, 18 S.Ct. 307, 42 L.Ed. 730; United States v. Devereux (C.C.A.) 90 F. 182, 187; Commodores Point Terminal Co. v. Hudnall (D.C.) 283 F. 150, 161; Herndon v. Vick, 89 Tex. 469, 475, 35 S.W. 141; Taylor v. Watkins, 26 Tex. 688, 695; Baldwin v. Goldfrank, 88 Tex. 249, 255, 31 S.W. 1064; Magee v. Paul, 110 Tex. 470, 221 S.W. 254, 255; Baldwin v. Roberts, 13 Tex.Civ.App. 563, 36 S.W. 789; Herndon v. Burnett, 21 Tex.Civ. App. 25, 50 S.W. 581, 582 (Writ of Error denied by Supreme Court); Bringhurst v. Texas Co., 39 Tex.Civ.App. 500, 87 S.W. 893; Brewer v. Cochran, 45 Tex. Civ.App. 179, 99 S.W. 1033 (Writ of Error denied by Supreme Court); Frugia v. Trueheart, 48 Tex.Civ.App. 513, 106 S.W. 736, 737 (Writ of Error denied by Supreme Court); Surghenor v. Ayers (Tex. Civ.App.) 139 S.W. 28, 29 (Writ of Error denied by Supreme Court); Fowler v. Texas Exploration Co. (Tex.Civ.App.) 290 S.W. 818, 819 (writ of error denied by Supreme Court).

■ These facts compel a finding and create a presumption that the grant to Procella by the commissioner was signed after the closing of the land offices and not before.

■ 5. The Commission of Appeals of Texas, in Allen v. West Lumber Co., 244 S.W. 499, 501, uses this language: "The doctrine that the legal title to real estate could be lost by 'abandonment' is unknown to the common law. Inasmuch as the people of Texas have been governed by the common law since March 16, 1840, when an act of Congress abolished 'civil law,' the theory of abandonment of title is novel to most of us. However, it was a well-settled principle of the Spanish civil law and obtained in the Spanish colonies even after the latter, in many instances, became independent nations."

See, also, Sideck v. Duran, 67 Tex. 256, 262, 3 S.W. 264; Sena v. United States, 189 U.S. 233, 23 S.Ct. 596, 47 L. Ed. 787.

That it is the law in Texas that prior to the adoption of the common law in 1840, title to grants such as this could be lost by abandonment with the intention of abandonment, cannot be doubted. Such abandonment may be shown by circumstances the same as any other fact. The circumstances in this case point to such an abandonment of this league of land by Procella. And this is true whether the grant to him was, or was not, valid. It is clear that all of the Procella survey called for in its field notes was in conflict with the older grant to Morales, except a small tract, of which the 181

acres involved herein is a part. The dormant condition of the Procella title and the nonclaim upon the part of Procella and his heirs, as hereinbefore pointed out, is consistent both with the invalidity of the grant to Procella and with its abandonment by Procella prior to the adoption of the common law in Texas.

6. On the whole record, I think it must be held that the receiver had the superior title to the land in controversy, and that his exceptions to the master's report should be sustained, and decree entered in his favor.

Let decree be drawn and presented accordingly.