## UNDERWOOD *v.* DUGAN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF TEXAS.

No. 223.  Submitted March 17, 1891. — Decided March 30, 1891.

Forty-three years after the ancestor of the plaintiffs acquired title, more
than twenty years after that ancestor had positive information of the
wrong upon which the claims set up in this bill in equity are grounded,
twenty-five years after the purchase by the defendant in good faith and
with no knowledge of the wrong, this suit was commenced, without any
assertion of the right now set up having been made during all that time.
*Held*, that these facts disclosed laches which forbade the interference of
a court of equity.

IN EQUITY.  Decree dismissing the bill.  Complainants appealed.  The case is stated in the opinion.

*Mr. W. Hallett Phillips* for appellants.

*Mr. Sawnie Roberson* and *Mr. W. O. Davis* for appellees.

MR. JUSTICE BREWER delivered the opinion of the court.

The facts in this case are these:

On March 1, 1838, one Fines Y. Roberson, whose name seems to have been spelled in different ways, sometimes as above stated, sometimes as "Phineas Robertson," again as "Phiness Y. Robinson," still again as "Phiness Robinson," received from the proper authorities of the State of Texas the following land certificate, entitling him as therein provided, and on the conditions therein named, to one league and labor of land:

"No. 127.

"This is to certify that Fines Y. Roberson has appeared before the board of land commissioners for the county of Houston and proved, according to law, that he arrived in this Republic, Jan'y —, eighteen and thirty-five, and that he is a

married man and entitled to one league and labor of land upon the conditions of paying at the rate of three dollars and fifty cents for each labor of irrigable lands, two dollars and fifty cents for each labor of temporal or arable land, and one dollar and twenty cents for each labor of pasture land which may be contained in the — secured to him by this certificate.

"Given under our hands the 1st day of March, 1838.

"E. GASSETT, *President.*

"JOHN WORTHAM,

"Attest: SAM'L G. WELLS, *Clerk.*        *Ass. Com'rs.*"

On the 5th day of March, 1838, he transferred a one-half interest to Warner L. Underwood. The evidences of this transfer were an assignment on the back of the certificate, as follows:

"For value received, I assign and convey unto Warner L. Underwood the within certificate, as by deed also of this date. March 5th, 1838.

"OSCAR ENGLEDOW.            "FINES Y. ROBERSON."
"H. B. DANCE.

and a deed of the same date, to the same party, which disclosed that only one-half interest was conveyed, the other one-half being reserved for the benefit of Joshua Robbins, to whom Roberson had already transferred such interest. No land was ever located by Underwood or Robbins under this certificate. Soon after this Underwood returned to Kentucky and remained there until his death. Thereafter, and on the 12th of May, 1855, a written assignment of this certificate was made by Roberson to Dennis Trammell. On the back of the certificate was pasted a thin brown paper, apparently for the purpose of protecting the certificate against wear and tear, but at the same time effectually concealing from observation the assignment to Underwood, written thereon. This certificate, thus on its face the property of Roberson, together with the accompanying written assignment to Trammell, were offered for sale to S. W. March, who, ignorant of any pre-

vious transactions, purchased the same in good faith, paying one thousand dollars, and receiving an assignment and transfer from Trammell. This was on June 23, 1855. March located this certificate, and on August 8, 1855, received from the State of Texas a patent for the lands located thereunder. On May 15, 1860, by letter from one James Jeffries, Underwood was notified of the location of the land by March, and of the patent to him, together with the fact of the concealment of the transfer from Roberson to himself, by means of the paper pasted on the back of the certificate. No action was taken by Underwood during his lifetime. He lived nearly twelve years after the receipt of this information, dying in February, 1872. During the last three or four years of his life, by reason of disease, he was incapacitated for attention to business. March, the purchaser of the certificate, the locator of the lands, and the patentee from the State, died on the 29th of July, 1878. This suit was commenced on June 13, 1881. The plaintiffs claim as heirs of Underwood, or purchasers from the heirs of Underwood and Robbins, and represent all the rights of Underwood and Robbins, except an undivided interest of one-sixteenth, belonging to A. N. Robbins, one of the heirs of Joshua Robbins, who was made a defendant, and who submitted to an order *pro confesso.* The other defendants claim under the patentee, March. The principal defence is laches, which in the judgment of the Circuit Court was sufficient, and the bill was ordered dismissed. 24 Fed. Rep. 74. In that conclusion we concur.

From the facts above stated, it appears that the bill was not filed until forty-three years had passed since the ancestors of plaintiffs acquired title to the certificate. During all these years no assertion of right was made by either Underwood or Robbins, or those claiming under them. Twenty-five years before the filing of the bill, March purchased the certificate in good faith, paying a large consideration, located it and obtained a patent for the lands from the State. He entered into possession and improved the lands. The original purchasers, Underwood and Robbins, are dead, the subsequent purchaser and patentee is also dead, and with their death the main wit-

nesses to this transaction have all passed away. The property has become of value, and now, after a lapse of nearly half a century, plaintiffs assert a claim which the owners have ignored for all these years. It appears that Underwood, when he returned to Kentucky, soon after the purchase, returned in consequence of the death of his father, who left a large estate, somewhat complicated. Probably he considered attention to such estate, and its large interests, of more importance than this float of doubtful value, in a distant country of large area and small population. But whatever may have been the reason, surely this long delay discloses laches, and such laches as forbid the present interference of a court of equity. We have had before us this present term a somewhat similar case coming from the same State and the same district, *Hanner* v. *Moulton,* 138 U. S. 486. There, as here, the controversy arose in respect to land taken under a land certificate issued in 1838. There, as here, the plaintiffs claimed title by succession from the original purchaser, who had died prior to the commencement of the suit. There, the adverse title under which defendants claimed did not arise until 1869, and knowledge of the adverse title did not come to plaintiffs until 1876. The bill was filed in 1882, a few months after the bill in the present case. We held on full review of the rulings of the Supreme Court of Texas, as well as the decisions of this court, that laches was a complete bar to the suit. Summing up at the close of the opinion, Mr. Justice Blatchford, speaking for the court, said: " An interval of nearly thirteen years elapsed between the sale of the certificate and the filing of the bill in this suit. The value of the property has largely increased. Parties interested and witnesses have died, and the memory of those who survive has decayed. Not a person who is now interested in any of the land is implicated in the fraud charged in the bill. Under the facts above stated, the plaintiffs have been guilty of such laches that they cannot have any relief in a court of equity. *Speidel* v. *Henrici,* 120 U. S. 377, 387, and cases there cited; *Richards* v. *Mackall,* 124 U. S. 183, 187, 188." See also *Landsdale* v. *Smith,* 106 U. S. 391.

Much stronger than that is this case. Not thirteen, but

twenty-five years, intervened between the sale of the certificate, the patent of the land and the commencement of this suit. More than twenty years before its commencement, Underwood, under whom plaintiffs principally claim, had positive information as to the wrong which had been done, and the manner in which it was done. All the parties to the original transaction are dead. The property has increased in value, and now these plaintiffs are invoking the aid of a court of equity to dispossess those who personally have acted in good faith, who were not parties to, or cognizant of, any wrong, and who have occupied and improved the property in full reliance upon the sufficiency of the title they possessed. Surely if laches is ever recognized as a complete bar, it ought to be in this case. And this doctrine of laches rests on no arbitrary or technical rule. It is founded on the plainest principles of substantial justice. Ownership of property implies two things: First, attention to it; second, a discharge of all obligations, of taxation or otherwise, to the State which protects it. When it appears that one who now asserts a title to property, arising more than the lifetime of a generation ago, has during all these years neglected the property and made no claim of title thereto, a reasonable presumption is that, whatever may be apparent on the face of the instrument supposed to create the title, were the full facts known, facts which cannot now be known by reason of the death of the parties to the transaction, it would be disclosed that no title was in fact obtained; or, if that be not true, that he considered the property of such little value that he abandoned it to the State which was protecting it. So, if, the title being beyond challenge, during these years he pays no taxes thereon, makes no effort to improve or increase its value, and, by the labor and efforts of others, under the protecting power of the State, large value has been given to it, the State may properly say to him, as may also the individuals who have thus wrought this change in value: You abandoned the property when it was comparatively valueless; you have taken no share in the burdens of taxation or the support of the State; others have toiled, paid taxes, and made the property valuable; therefore,

because of your shirking of duties and obligations, you shall not, whatever may have been the nature of your title in the first instance, be permitted to appropriate the value thus produced by others.

Looking back through the fifty years which now have passed since Underwood purchased an interest in this certificate, general history discloses a marvellous change in the condition of things in the State of Texas. Then an enormous territory, a scanty population, real estate of comparatively trifling value, sold by the league and not by the acre; now, a State of large area it is true, but with a vast and growing population, whose industries have made its real estate of value. Surely a court of equity may look with jealous eye upon the claims of any one to a share in that value, based upon a title acquired half a century ago, a title which he has ignored all these years, and a value in the accomplishment of which he has had absolutely no part.

We see no error in the ruling of the Circuit Court, and its decree is *Affirmed.*