**OLYMPIA WERKE
AKTIENGESELLSCHAFT,
Plaintiff,**

**v.**

**GENERAL ELECTRIC COMPANY,
Defendant.**

Civ. A. No. 77–0069–R.

United States District Court,
W. D. Virginia,
Roanoke Division.

May 26, 1982.

Harwell M. Darby, Eggleston & Glenn, Roanoke, Va., Spencer & Kaye, Washington, D. C., for plaintiff.

Edward F. McKie, Jr., Schuyler, Banner, Birch, McKie & Beckett, Washington, D. C., William B. Poff, Roanoke, Va., for defendant.

TURK, Chief Judge.

This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. The suit was filed on April 19, 1977 and alleged infringement by defendant's data terminal belt printers (i.e., "TermiNet") of United States Patent Number 2,936,704 granted May 17, 1960 (hereinafter referred to as the '704 Patent). Title to the patent was at all times in plaintiff's possession. Jurisdiction and venue of this court are based upon Title 28, United States Code §§ 1338(a), 1400(b), and 1391(c).

The sole issue before the court at this time is the applicability of the equitable defense of laches. Defendant initially asserted the laches defense in its motion for summary judgment. In an opinion rendered on April 4, 1979, this court denied defendant's motion for summary judgment and ordered that a separate trial be held on the issue of laches. *Olympia Werke Aktiengesellschaft v. General Electric Company*, 470 F.Supp. 966 (W.D.Va.1979). In its opinion, this court specifically noted that resolution of the laches question necessarily involved "greater exploration of the responsibilities of the corporate officials." *Id.* at 968. Accordingly, a trial on the issues of laches was conducted on October 27 and 28, 1981. The evidence presented during that trial, detailed below in the Findings of Fact, clearly demonstrates the appropriateness of the laches remedy. Accordingly, final judgment will be entered in favor of defendant on the basis of laches.

## FINDINGS OF FACT

1) Plaintiff, Olympia Werke Aktiengesellschaft (hereinafter referred to as Olympia), is a corporation organized and existing under the laws of the Federal Republic of Germany, and has its offices and principal place of business at Wilhelmshaven, Federal Republic of Germany.

2) Plaintiff is a wholly-owned subsidiary of Allgemeine Elektricitats—Gesellschaft AEG–TELEFUNKEN (hereinafter referred to as AEG), a corporation organized and existing under the laws of the Federal Republic of Germany.

3) Defendant, General Electric Company (hereinafter referred to as GE), is a corporation organized and existing under the laws of New York and has places of business and is doing business at Waynesboro, Virginia; Lynchburg, Virginia; and Salem, Virginia.

## THE '704 PATENT

■ 4) The '704 Patent concerns a high speed line printer apparatus. Claim 1 of the patent has been disclaimed. Nevertheless, it will be considered because the claims in suit are dependent on that claim and therefore include all the limitations of claim 1. 35 U.S.C. § 112 (1952).

5) Claim 1 describes a typewriter-like printing apparatus; that is, an apparatus in which printing on a web of paper is effected in one direction (e.g., horizontally) and the paper web is shifted in another direction (e.g., vertically), so that printing is in line-by-line fashion. Claim 1 reads as follows:

1. A high speed printing apparatus of the type described and adapted for printing on a paper web in a plurality of parallel straight zones of the latter, comprising a number of type-bearing elements, an endless carrier for said type-bearing elements, and adapted for effecting a cyclic movement of said type-bearing elements in a given plane and a straight movement over at least one given reach; means for supporting a paper web so that a straight zone of the latter extends parallel to said given reach of said endless carrier and destined for the printing of a textline thereinto; means for shifting said paper web line-by-line in a direction perpendicular to said straight zone; means for effecting said cyclic movement of said type-bearing elements in said plane; said type-bearing elements being disposed on said endless carrier next adjacent each other and adapted for selection and temporary displacement at right angle to said movement, in the direction toward said paper web zone; means for urging said type-bearing elements toward said textline zone, for effecting a printing of a type character on said paper web and means for retracting said type-bearing elements after effecting a printing.

6) The claims of the '704 Patent asserted against GE are claims 3, 6, 8 and 15, each of which refers back to and is therefore dependent on previously disclaimed claim 1. Claims 3, 6, 8 and 15 read as follows:

3. A high speed printing apparatus as described in claim 1, characterized in that said endless carrier is an elastic belt of plastic material.

6. A high speed printing apparatus as described in claim 1, wherein said type-bearing elements are a plurality of resilient tongues associated with said endless carrier, each of which tongues extends transversely to the longitudinal extension of said carrier and at least part of which tongues bears a type at the free tongue end.

8. A high speed printing apparatus as described in claim 1, wherein said carrier is an endless resilient belt of plastic material, and wherein said type-bearing elements are resilient metal tongues embedded in said belt and extending transversally to the longitudinal extension of the latter, at least part of said tongues bearing a type at the free tongue end.

15. A high speed printing apparatus as described in claim 1, wherein said means for urging said type-bearing elements toward said textline zone comprise hammers and are housed within the area confined by said endless carrier.

## PLAINTIFF'S KNOWLEDGE OF THE '704 PATENT

7) The '704 Patent is for a line printer developed at Olympia in connection with an electronic data processing system called the Omega system. The line printer was developed in the late 1950's, the '704 Patent having been filed in the United States in

1958 and based on a German application filed in 1957. The '704 Patent named Mr. Theo Hense as the inventor.

8) The Olympia line printer was referred to as the Hense line printer and was based on the chain principle. A printer employing the chain principle featured a moveable chain with type faces attached to it.

9) The Omega system was developed in the Electro-Technical Laboratory (ETL) at Olympia's main plant in Wilhelmshaven. The development was carried out in a special building requiring a special permit for entry. Only four employees worked on the development of the Omega line printer.

The line printer development was initially the responsibility of Mr. Hense who left Olympia in 1961. During the time the Omega system was being developed by Olympia, the ETL laboratory was headed by Dr. Breitling. Breitling left Olympia on September 30, 1963. Mr. Hense's position was subsequently filled by Mr. Hugo Reischer.

10) Development of the Omega system was terminated in September of 1962. However, Olympia's development of the line printer did not cease until 1963.

11) In 1964, permission was received by the Olympia Patent Department from the Olympia Board Member for Production and Development, Mr. Otto Reichert, to abandon all patents and patent applications other than the U. S. Patent. Foreign patents and patent applications on the line printer, other than the '704 Patent, were offered to the inventor Hense, and then abandoned since Olympia no longer had any interest in maintaining patents on the line printer and wished to avoid the need for continued payment of substantial annuities. The U.S. '704 Patent was not offered to Hense or abandoned since no annuities needed to be paid.

12) The German patent application for the line printer was abandoned due to Olympia's lack of interest in response to a letter from the patent office asking whether Olympia wished to continue the prosecution of the application.

13) Mr. Guenther, head of Principal Department VOL within Olympia's Sales and Marketing Division dealing with Organization Machines and Data Processing, was familiar with the Hense line printer. In addition, Mr. Guenther, Dr. Reinecke, and Mr. Heymann were aware that Olympia patents on the chain principle existed. In 1961 and 1962, Mr. Guenther authored two articles describing the printer as employing the chain principle. The 1962 article described the printer as follows:

h) Line printer

The latter operates according to the chain principle and has a 120 digit ring core-buffer storage as well as 2 collators for the variable arrangement of the printer style. The feed of line printer is programmable. There are 120 printing points (10 symbols/inch). The space between lines amounts to 6 lines/inch.

Alpha-numerically for 48 lines, the speed at present amounts to 14,000 lines/hr, purely numerically for 10 numbers and 2 algebraic signs 36,000 lines/hr. The paper feed lies at about 70 lines/sec.

The line printer may moreover operate in the off line operation by coupling with the photoelectric tape reader. A coupling of the line printer with the card reader or with a magnetic tape device is in preparation. (Guenther, "Die elektronishe Datenverarbeitungson'age Olympia OMEGA und ihre Einsatzmoglichkeiten," Elektronische Datenverarbeitung, February 1962).

14) Guenther had knowledge of the '704 Patent. During negotiations with GE held in 1963, Guenther was informed by Dr. Breitling that patents had been granted for the chain principle or chain printer. In addition, during the licensing discussions with NCR in 1964, information was requested by NCR on the patent situation pertaining to Olympia's line printer. Guenther then sought, and obtained, this information from the Olympia Patent Department which included a list of sixteen patents granted on the printer. This list expressly identified the '704 Patent. In addition, Guenther notified both Mr. Reinecke and

Mr. Heymann that U.S. patents had been granted to Olympia on its line printer. Mr. Guenther stated in a memorandum:

Re: *Olympia line printer*

\* \* \* \* \* \*

The first discussions on this subject were held in Wilhelmshaven on 6/11/1964. NCR needs documents concerning the patent situation of this printer for further discussion. Attention was called to the fact that, to our knowledge, patents had been granted in the U.S.A. for the chain principle. (Guenther Memorandum, June 12, 1964).

### DEFENDANT'S KNOWLEDGE OF THE '704 PATENT

15) "TermiNet," a high speed printer developed by the Specialty Control Department (hereinafter referred to as SCD) of GE, is the printing device alleged to infringe the '704 Patent. Prior to commercial production of the GE printer, Michael Masnik, Patent Counsel for the Specialty Control Department, gave to responsible officials of that department an oral opinion that the printer did not infringe the '704 Patent and that the patent was invalid.

### PLAINTIFF'S KNOWLEDGE OF THE TERMINET PRINTER

16) The first meetings between GE and Olympia personnel relating to the TermiNet printer occurred on October 3rd and 4th, 1968.

17) A meeting was held on October 3rd, 1968 between representatives of GE who were involved with the TermiNet printer and representatives of AEG in Frankfurt, Germany for the purpose of interesting AEG in taking a license from GE to manufacture and sell the TermiNet printer in Europe. At that meeting, a general description of the TermiNet printer was presented by GE representatives Ponzillo, Kindt and Snell. Ponzillo was General Manager of SCD in Waynesboro; Mr. Kindt was Manager of Engineering for SCD; and Snell was Manager of the Data Communication Printer Operation within SCD and

responsible for the development of the printer.

18) During the meeting with AEG on October 3, 1968, the operation and design of the GE TermiNet printer were explained in detail. By means of an oral presentation, the GE officials provided the AEG officials with a detailed description of the high-speed chain printer principle. That presentation included the display of black and white photographs, the distribution of printed technical specifications, and a slide presentation. In addition, several component parts of the TermiNet printer, including samples of integrated circuits and either a belt or section of a belt having a sample of each of the four hammer shapes and the clevises that separate them, were exhibited.

19) Moreover, a number of representatives of AEG, including Dr. Nasko, the head of AEG's Engineering Services Department, and his assistant, Dr. Seifert, were present at the October 3rd meeting. Two representatives of Olympia, Mr. Heymann and Mr. Wehner, were also present. Heymann was employed by the Development Division of Olympia and was responsible for designing peripheral equipment (e.g., printers); while Wehner was with the Sales and Marketing Division of Olympia charged with responsibility for Training and Competitive Monitoring.

20) Minutes of the October 3, 1968 meeting were drafted by Dr. Seifert. Copies of these minutes were sent, *inter alia*, to Dr. Haemmerling, the head of research and development for AEG, and to Dr. Reinecke and Mr. Hehn of Olympia.

21) The AEG minutes of the October 3, 1968 meeting include the following:

The meeting was held at the request of the General Electric Company for the purpose of presenting their newly developed data input/output machine TermiNet 300. To date, 15 units have been made of this machine which are in the testing stage. May 1969 is the tentative date for the start of production. ...

The design concept of the machine is based on the application of electronic

technique to the functions, so that the mechanical system can exclusively be applied to the actual printing.

The printer, which works according to the principle of the high-speed chain printer with a rotating plastic belt on which the letters are mounted resiliently, is capable of making up to 7 copies. The letters are struck against the paper in the individual writing positions with electromagnetically driven hammers. (Seifert, Minutes of October 3, 1968 GE/AEG meeting in Frankfurt).

22) Olympia was considered to be a prime candidate for manufacturing the printer under GE license. Accordingly, the GE representatives visited Olympia at Wilhelmshaven on October 4, 1968 to interest Olympia in taking the license to manufacture the TermiNet printer. The representatives of Olympia attending this meeting were Mr. Guenther of the Sales and Marketing Division and Mr. Riffert of the Development Division.

23) During the Olympia meeting of October 4, the representatives of Olympia received the same presentation previously given at AEG. The operation and design of the GE printer, including the hammer, typeface and belt design, were explained in detail to the Olympia officials. While the circuits contained in the large scale integrated circuits were not revealed to Olympia, component parts of the line printer were displayed. The GE representatives concluded their visit by touring the Olympia plant. Thus, by October 4, 1968, responsible executives from both AEG and Olympia, as well as their staffs, were aware of the technical details of construction and the mode of operation of the GE TermiNet printer.

24) Moreover, in October 1968, GE communicated with AEG and Olympia in an effort to discern their interest in obtaining a license to manufacture the GE printer. On January 21, 1969, Olympia expressed their interest in the marketing and manufacture of the printer in principle. Olympia notified GE, however, that it desired to thoroughly inspect the construction and the mode of operation of the TermiNet 300 before rendering a licensing decision.

25) In March, 1969, a news release with photographs of the TermiNet printer was distributed to the trade and business press and to the business and financial editors of all daily newspapers in the United States having a circulation over 50,000. That release described the components of the TermiNet printer in detail:

The new GE data terminals printing concept centers around type characters which are rotated horizontally in front of a bank of hammers. Two complete sets of 94 different type characters are included to allow upper and lower case printing. Hammers are activated which in turn drive the desired character against the paper through the ink ribbon. By using this concept, left to right printing is achieved without utilizing a moving carriage, such as found in most typewriters. (GE news release, March 18, 1969).

26) Subsequently, articles describing TermiNet, including the details of its mode of operation, appeared in several industry publications including *Electronics News*, dated March 24, 1969; *Computer World*, dated April 2, 1969; *Business Week*, dated April 5, 1969; *Electronics*, dated April 14, 1969; *Datamation*, dated May 1969; *The Wall Street Journal*, dated June 2, 1969; and *Electronic Design*, dated June 7, 1969.

27) On May 13–15, 1969, the first public showing of TermiNet took place at the Spring Joint Computer Conference in Boston. The TermiNet printer was on display, and was operated during the conference.

28) In June, 1969, *The Wall Street Journal* reported that GE had recently received an order for 3,000 TermiNet printers from Dow-Jones. The *Journal* provided a detailed description of the operation of the TermiNet printer:

The unit has a horizontally rotating belt located where a typewriter's keys normally are. Inserted vertically into the belt are "fingers" of metal, each one with a letter or numerical character on its face. A small hammer in each of the 43 printing positions moves forward on impulse,

striking the fingers, causing the character to be imprinted on the paper as the belt moves from right to left in front of it. ("Dow Jones News Service to Change Over to High-speed Printers Produced by GE," *The Wall Street Journal*, June 2, 1969).

29) Neither Olympia's nor AEG's files contained any of these specific publications and no officials have any recollection regarding them. Nevertheless, throughout the period in question, Ulrich Wissmann was employed by AEG as its resident engineer in Schenectady, New York and functioned as a liaison between AEG and GE. His duties included: acting as mediator in scheduling visiting dates between AEG and U.S. concerns; procuring literature and data for forwarding to AEG concerning American developments and new products; and implementing and administering communications between AEG and GE regarding license agreements.

30) In April, 1970, International Computers Limited (ICL), a British Company, exhibited the GE-manufactured line printer at the Hanover Fair in Germany and provided brochures describing the printer. The Hanover Fair is the largest annual trade fair in the world. Olympia has had an exhibit at the fair each year and a number of Olympia's sales staff and engineers attend the fair each year. The line printer exhibited at the fair, as shown in the brochures, contains only ICL identifying marks. In addition, the brochures contain no reference to GE or to the fact that the printer was manufactured in the United States. The ICL exhibit at the 1970 fair was located in the same pavilion with an Olympia exhibit.

31) AEG's interest in the TermiNet printer was communicated to GE on June 16, 1970. AEG's liaison with GE, Wissmann, reported shortly thereafter to AEG regarding the status of the TermiNet printer and GE's attitude:

I understand that already more than 100 units exist here in the United States and that they had been well received. According to Mr. W. Kindt, General Manager of the Department, licensing agreements have already been signed with several European firms. However, the equipment is not yet available, not even as a result of manufacture under license. GE is still not uninterested in negotiating a possible license agreement with us, although the reaction to the initial discussions with Olympia in this regard two years ago was negative. (Wissmann Letter to Dr. Marenbach, June 16, 1970).

32) On June 18, 1970, GE provided Wissmann with several copies of the TermiNet Operator's Manual, Program Manual, Parts Manual, a brochure and a price list for forwarding to AEG. These materials revealed the construction details and mode of operation of the TermiNet printer. Sometime between August 18, 1970 and September 15, 1970, one copy of each of the materials provided by GE had been forwarded to Dr. Reinecke, Olympia's Executive Board Member for Development.

33) By September 15, 1970, Reinecke reported that Olympia had, after detailed consideration, decided against pursuing TermiNet:

Together with the marketing department we have examined in detail the possibilities afforded by the offer and have come to the conclusion that at the present time we cannot plan the TermiNet 300 into our sales program.

We ask that you kindly pass on this position.... (Reinecke letter to Mr. Bachl, September 15, 1970).

In essence, Olympia at that time considered the Terminet 300 to be economically prohibitive compared with simpler machines.

34) In June, 1971, AEG learned that GE was introducing a higher speed TermiNet printer. Apart from the enhanced printing speed, the features of the higher speed TermiNet printer remained identical to the features found in the earlier TermiNet printer.

35) After Olympia indicated to AEG that it was interested in the higher speed TermiNet printer, Nasko wrote to GE on June 24, 1971, stating:

As you certainly know we are in contact with your division already about two

years in this matter. Our Olympia people, who would be most suited for a license, as they are dealing with this type of product, told us however in the past, that for the capacity of your product concerning printing speed the price is too high compared with other products for the same purpose. (Nasko letter to Mr. Tutle, June 24, 1971).

He indicated, however, that Olympia was interested in a license to manufacture the higher speed TermiNet printer and in obtaining a sample machine.

36) On July 15, 1971, Reinecke requested Nasko to order a TermiNet printer for Olympia. Reinecke elaborated that:

This apparatus is to be used as a sample for engineering and marketing.

We shall try to arrive at a decision regarding the licensing by the start of the first quarter of 1972.

37) On July 16, 1971, Reinecke informed several departments within Olympia that a TermiNet printer had been ordered for Olympia. He requested the Patent Department, under J. Bruegge, to prepare an opinion on the proposed licensing agreement proffered by GE and asked the Marketing Department to examine sales possibilities for the TermiNet printer. Bruegge examined leaflets describing the TermiNet printer and on November 10, 1971 submitted his opinion regarding the proposed licensing agreement. Bruegge concluded that Olympia's engineers should evaluate the printer to determine whether the system had sufficient merit to justify the royalty fees. Bruegge's examination of the licensing agreement constituted his first knowledge of the existence of GE's TermiNet printer.

38) A TermiNet printer was received by Olympia on October 28, 1971. Olympia subsequently investigated the TermiNet printer from a technical viewpoint to determine its production potential. A highly detailed investigation report was completed by November 10, 1971.

39) On October 7, 1971, Reinecke, H. Voss, the President of Olympia, U.S.A., and Wissmann visited Waynesboro. During this visit, they viewed the TermiNet printer in operation, discussed proposed licensing agreements, and received very detailed information regarding manufacture of the equipment. Reinecke also received a copy of the TermiNet Service Manual.

40) Olympia's evaluation of the desirability of a license continued from October 1971 into January of 1972. On January 28, 1972, Olympia reported to AEG that, while manufacture under license would present no problem to Olympia from the point of view of production engineering, the marketing division regarded the range of applications, especially in view of the price, as being too limited. In March, 1972, GE was informed by Nasko of Olympia's decision. Even though a license was declined, the superiority of TermiNet was acknowledged by Nasko.

Although we are convinced of the technical quality of your product, we regret having to inform you today that our investigations have led to a negative result.

\* \* \* \* \* \*

Olympia cannot at present offer a terminal as good as TermiNet 300 and yet we believe in the reasons cited above. These would not permit Olympia to build and sell your licensed products; we will have to wait for our own developments, possibly for the next generation of semi-mechanical printout units. (Nasko letter to Tutle, March 6, 1972).

41) On October 16, 1972, executives of AEG visited Lynchburg and viewed the TermiNet printer in operation. In addition, on September 14, 1973, executives of an AEG affiliate, Hartmann and Braun, visited the Waynesboro plant. During that visit they viewed TermiNet printer products and the TermiNet printer manufacturing facilities. In addition, GE discussed its intention of contracting with Hartmann and Braun on a reseller basis.

42) In October, 1973, GE's Manager of International Licensing, Mr. Tutle, met with Dr. Schlottmann, of Nasko's department, to discuss the licensing of TermiNet printer manufacture or the creation of reseller status. At this meeting this GE exec-

utive was informed that Schlottmann and others at AEG considered the TermiNet printer to be the best of its type. Subsequently, Schlottmann informed Nasko and Dr. Reinecke that:

[I] informed Mr. Tutle that within the concern only Olympia Werke AG would come into consideration as a direct partner. No new viewpoints are known that would alter the decision regarding the reseller status or the licensing taken in the spring of 1972. HE/E will pass on to interested parties in the concern, and particularly to Olympia Werke, the data concerning future TermiNet development. Mr. Tutle will send the most recent specifications on the TermiNet 300C and the TermiNet 1200A. (Schlottmann Memorandum, October 31, 1973).

43) Between late 1973 and early 1974, Olympia reexamined GE's licensing offer and again decided to decline it. On March 8, 1974, representatives of GE met with Dr. Nasko in Frankfurt at which time GE proposed the formation of a licensing pool composed of several European partners to justify the manufacture of the TermiNet printer under license. Subsequently, Dr. Nasko sent to the president of Olympia his notes concerning this meeting which state, in part:

I promised to discuss this proposal with Olympia and have let it be known that at any rate Olympia would have suitable production capabilities. In the meantime, GE will investigate until the next meeting what other European partners might be interested in such a project. (Nasko Memorandum, March 22, 1974).

On June 26, 1974, Olympia was informed of GE's continued efforts to improve the TermiNet printer:

Two terminals with higher printing speeds are likewise being developed, one of which is said to print at 340 lines a minute. Same technical principle as the TermiNet 300/1200 with rotating belt, but containing only upper case characters and, hence, the alphabet 4 times on the rotating belt. (Wissmann letter to Reinecke, June 26, 1974).

Nevertheless, in August, 1974, Dr. Reinecke related to Mr. Wissmann that "sales of GE TermiNet series by the Olympia sales organization are not feasible." (Reinecke letter to Wissmann, August 9, 1974).

## RESPONSIBILITIES OF KEY OLYMPIA PERSONNEL

44) Olympia's knowledge of the TermiNet printer was acquired through the following responsible top-level executives of Olympia: Dr. Reinecke, Mr. Heymann, Mr. Riffert, Mr. Hehn, Mr. Guenther, and Mr. Wehner. Reinecke and Hehn were members of the Executive Board which controlled and operated the company and determined if new products should be adopted by the company. Reinecke was the head of the Development Division and had a special power of attorney to bind the company in legal transactions. He not only knew of U. S. patents being granted to Olympia on its line printer and, particularly, on its line printer employing the chain principle, he was charged with the responsibility of making efforts within his Division to inspect competitors' models for potential patent infringement. He signed the '704 Patent infringement notice ultimately presented to GE. Riffert, who had special power of attorney, and Heymann reported directly to Reinecke within the Development Division and were in charge of all typewriter development and printer development, respectively. Heymann headed the Department which had previously performed the work resulting in the '704 Patent and was aware that U. S. patents had been granted to Olympia on a line printer employing the chain principle. As members of the Development Division, Heymann and Riffert were likewise responsible to investigate, and report all potential patent infringements. Guenther, who also had special power of attorney to represent Olympia, reported directly to Hehn within the Sales and Marketing Division and had responsibility for sales promotion and marketing of printers. He had been involved in licensing discussions regarding Olympia's line printer and authored technical articles describing

this printer and its chain principle operation. He was actually aware of the '704 Patent. Wehner worked for Guenther and had the specific responsibility to monitor the types of equipment brought on the market by competitors.

45) Since at least 1968, Olympia had been controlled and operated by a single Executive Board having approximately five members. Included were a Chairman, a member in charge of Marketing and Sales, a member in charge of Development; and a member in charge of Production. Reinecke had been the member in charge of the Development Division from January 1, 1967 until his death in 1976 and Hehn had been the member in charge of the Marketing and Sales Division from January 1, 1968 until 1976.

46) As Executive Board member in charge of the Development Division (ED), Reinecke reported to the Chairman of the Board (V) and was responsible for all of the technical developments within the company. As of February 1, 1968, this position included responsibility for 6 Development Management Divisions consisting of approximately 53 Departments within Olympia. These Development Management Divisions included: General Development Management (EAL); Riffert's Development Management Division—Typewriter Development (ESL); Calculator Development (ERL); Heymann's Development Management Division—Organization and Data Processing Development (EOL); Plant and Equipment Development (EBL); and Patent Matters, Documentation and Organization Development (EPL). Reinecke's responsibilities included overall management and coordination of these Development Management Divisions and assuring compliance with company directives. In this capacity, Dr. Reinecke issued the following directive to the Olympia Patent Department (EPL–1) in 1968:

> In close cooperation with EPL our special attention must be directed at recording and protecting under the Patent law any newly developed ideas and patents for design solutions in order to safeguard the

Olympia-development. (Reinecke Memorandum, January 12, 1968).

This policy was more specifically enunciated by Olympia's Executive Board Chairman, Mr. Buesser, six months before GE's executives visited AEG and Olympia. In April 1968, Buesser asked Reinecke's Patent Department to inspect competitor's models for potential patent infringement. Buesser stated:

> I request you to take care that all competitor's models to the extent they can be obtained at fairs or by purchase within our corporation, be investigated for potential patent infringement, i.e., the gentlemen of the patent department must also see these machines.

> For such findings of patent infringement I would even gladly provide premiums for all participants from the development department. (Buesser Memorandum, April 22, 1968).

47) From 1958 until July 1st, 1962, Reinecke was in charge of calculator production. On July 1st, 1962, Reinecke became head of the Development Division reporting to Otto Reichert. In this capacity he had responsibility and control over all engineering operations within Olympia, including Department ETL which developed the '704 Patent. During the period from 1960–1963, the main development emphasis was on typewriters. However, there was also development in calculating machines, input and output apparatus for adding machines and on the Omega project.

48) Heymann succeeded Breitling as head of Department ETL on October 1st, 1963 reporting to Reinecke. At that time, the Omega project had already been abandoned. The Hense line printer was abandoned sometime in 1963. From April 1, 1967 through July 1969, Heymann was the head of Development Management Division EOL within Olympia's Development Division dealing with Organization and Data Processing (e.g. peripheral equipment such as printers) and reported directly to Reinecke. Division EOL was previously designated ETL. Heymann's responsibilities as head of Division EOL included developing

and designing peripheral equipment (e.g., printers), automatic typewriters and dictation equipment. As head of a Management Development Division he was an authorized representative of the Division, with responsibility for ensuring that the peripheral equipment designs conformed to the state-of-the-art.

As head of EOL and responsible for developing peripheral equipment within Olympia, Heymann attended the meeting at AEG on October 3, 1968 to observe the presentation of the GE Printer. As head of EOL, Heymann was required to report the details of the GE presentation to his superior, Reinecke.

49) Riffert was employed at Olympia from April 1950 to December 1980. He originally designed and developed mechanical and electric typewriters and in 1963 became head of typewriter development reporting to Reinecke.

From April 1967 through September 1974, Riffert was head of the Development Management Division within Olympia's Development Division dealing with Typewriter Development (ESL) and reported directly to Reinecke. His responsibilities as head of Division ESL included developing and designing typewriters. Nevertheless, Riffert was not connected with the Omega project or with the development of the Hense line printer.

As head of a Development Management Division, Riffert was an authorized representative of the Development Division, was responsible for ensuring that typewriter designs conformed to the state-of-the-art, and was required to determine equipment parameters on the basis of market observation and competition.

Like Reinecke, Riffert was appointed by the Supervisory Board as a prokurist on January 1, 1966. A prokurist is permitted to contractually bind the company by co-signing a contract with another prokurist or member of the Executive Board. Riffert attended the meeting with GE at Olympia on October 4, 1968 at the specific request of Reinecke to see whether the GE printer could be used as a typewriter. In view of Reinecke's request and Riffert's responsibility as head of ESL, Riffert had implicit responsibility to report the details of the GE presentation to his superior, Reinecke.

50) Mr. Hehn was one of the five Executive Board Members responsible for controlling and operating Olympia. He had been the Executive Board Member in charge of the Marketing and Sales Division (VD) of Olympia from January 1, 1968 until 1976. In this capacity, he reported to the Chairman of the Executive Board and was responsible for all marketing and sales within the company. He and Reinecke, together with the Executive Board Member in charge of production, the head of marketing, and the Chairman had the joint responsibility to determine whether a new product should be undertaken by Olympia.

51) From June 15, 1962 through December 1969, Guenther was the head of Principal Department VOL within Olympia's Sales and Marketing Division dealing with Organization Machines and Data Processing (e.g., peripheral equipment such as printers). In this capacity, Guenther reported directly to Hehn. Guenther's responsibilities included sales promotion and the marketing of peripheral equipment and typewriters. His department drafted the requirements of this equipment for the Development Division. His responsibilities further included the preparation of technical articles to publicize Olympia's developments in peripheral equipment. In fact, in 1962 he authored an article which technically described an Olympia Data Processing Installation employing a line printer utilizing the chain principle. Like Reinecke and Riffert, Guenther was appointed by the Supervisory Board as a prokurist on January 1, 1966. In addition, Guenther's responsibilities included some licensing negotiations. In 1964 he was involved in licensing discussions with National Cash Register (NCR) in an attempt to interest them in Olympia's line printer.

As responsible head for marketing and sales promotion of peripheral equipment within Olympia and experienced in printer licensing negotiations, Guenther attended

the meeting with GE at Olympia on October 4, 1968. He attended the presentation at Hehn's request and subsequently reported that the printer would not fit into Olympia's sales program.

52) Mr. Wehner was employed within Guenther's Principal Department VOL which was responsible for marketing and sales promotion of Olympia's peripheral equipment. In particular, from September 1, 1965 to February 14, 1969, Wehner was the head of the department for Training and Competitive Monitoring (VO4) and was, from February 1, 1968 to February 14, 1969, the Deputy Head of Principal Department VOL under Guenther.

Wehner's responsibilities included the monitoring of competitive equipment. The purpose of this monitoring was to ascertain Olympia's competitive position in the market. His duties included observing competitor's products at trade fairs and exhibits and preparing competitive surveys.

Wehner was required to report findings and information regarding competitor's products directly to Reinecke and Hehn. He attended the meeting at AEG on October 3, 1968 at the request of Hehn to observe the presentation of the GE printer. He was responsible for evaluating the value of this printer to Olympia from a sales viewpoint.

### NOTICE OF INFRINGEMENT

53) On October 21, 1974, over six years after Olympia learned of GE's line printer, Olympia, in a letter signed by Reinecke and Bruegge, charged that the GE printer infringed Olympia Patent No. 2,936,704.

54) On May 27, 1975, Olympia more specifically accused the TermiNet printer of infringing independent claims 1, 19 and 20, and dependent claims 3, 6, 8 and 15 of Olympia Patent No. 2,936,704. Subsequent negotiations between GE and Olympia were unsuccessful.

55) On October, 1976, Olympia filed a disclaimer in the United States Patent Office disclaiming independent claims 1, 19, 20 and 21 as "too broad or invalid." The disclaimer was filed by the Olympia Patent Department because they believed these claims were ultimately invalid. On October 6, 1976, Olympia informed GE of this disclaimer and of its continued belief that the TermiNet 300 infringed claims 3, 6, 8 and 15 of Patent 2,936,704.

### PREJUDICE

56) From 1968 until suit was filed in 1977, defendant invested large sums in the development and promotion of the TermiNet printer, in plant facilities, and in inventories and machinery for production of the printer. In addition, TermiNet printer sales increased many times; GE increased its staff for the production of TermiNet; documentary evidence is presently unavailable; key witnesses have died; and memories of other witnesses have dimmed.

57) Dr. Reinecke died in 1976. Reinecke was aware of Olympia's line printer development, that U. S. patents had been granted to Olympia on its line printer employing the chain principle, that his Division should make some effort to inspect competitor's models for potential patent infringement, and the general construction and mode of operation of the TermiNet printer. Moreover, for several years prior to his death, he had been involved in TermiNet licensing discussions with GE, had visited GE's TermiNet facilities, and had received various TermiNet printer manuals.

58) Seymour DePuy, the co-inventor of the TermiNet Reinforced Type Carrier Belt (Patent No. 3,605,613) and the patent liaison man for the TermiNet development project, died in early 1977.

59) Mr. Heymann, Division head responsible for developing and designing printers who attended the meeting at AEG on October 3, 1968, died on December 5, 1979. Heymann headed the Department which had previously performed the work resulting in the '704 Patent.

60) Mr. Wehner, Department head responsible for Training and Competitive Monitoring who attended the meeting at AEG on October 3, 1968, left Olympia on December 31, 1969.

61) Mr. Hehn, the Executive Board member in charge of the Marketing and Sales Division, left the employ of Olympia on December 31, 1975.

62) Mr. Riffert, Division head responsible for developing and designing typewriters who attended the meeting at Olympia on October 4, 1968, left Olympia on January 31, 1980.

63) In 1971, Reinecke had documents in his possession relating to the TermiNet printer; in 1977, however, none of Reinecke's files relating to the TermiNet printer or contacts with GE were found when a search was made pursuant to GE's document request. Although Olympia does not have a policy regarding destruction of records, Reinecke's files relating to the GE line printer have not been located.

64) Despite all the correspondence, contacts and information transmitted between GE and Olympia during the years in question, no documents, dated prior to September 1974, could be found within Olympia's files relating in any way to the GE printer except for three documents relating to GE's proposed licensing efforts during late 1971. The only other documents relating to the GE printer which could be found in Olympia's files were TermiNet printer related patent applications which had been available for some long period of time in Olympia's library.

65) Before introduction of the TermiNet printer, a general reserve account based upon a 5% sales assessment was initially recommended. The reserve account subsequently established for any potential TermiNet patent litigation totalled $350,000 by December 3, 1970. This account was decreased to $200,000 by December 31, 1971, and to zero by December 31, 1972. The reserve account funds were diminished because sufficient time had elapsed without infringement accusations being made against GE's TermiNet printer.

66) Since 1968 GE has developed and introduced various TermiNet printer models. Each new model developed was more improved and faster than the preceding models, but each printer employed essentially the same belt design. In addition, during this period of time, many accessories and options for the TermiNet printer were developed and introduced.

67) From 1968, continuing until the end of 1974, GE expended several million dollars on research and development of the TermiNet printer; increased its TermiNet printer inventories many times over from 1968 to 1974; expended several million dollars on TermiNet printer plant and equipment additions; expended over 1 million dollars on investment related expenses for TermiNet printer plant and equipment additions; increased its manpower many times over from 1968 to 1975; incurred several million dollars in TermiNet printer tooling expenditures; increased its plant capacity several times over from 1969 to 1975; incurred long term leases for TermiNet printer production having a total estimated value of several million dollars; and expended over 1 million dollars on TermiNet printer advertising and sales promotion.

68) Moreover, from 1974 until the end of 1976, GE expended several million dollars on research and development of the TermiNet printer; increased its TermiNet printer inventories over a million dollars; expended several million dollars on TermiNet printer plant and equipment additions; expended several hundred thousand dollars on investment related expenses for TermiNet printer plant and equipment additions; incurred over several hundred thousand dollars on TermiNet printer advertising and sales promotion.

69) TermiNet printer sales have increased from several hundred thousand dollars in 1969 to many million dollars by 1977. The total TermiNet printer sales from 1969 until the end of 1976 amounts to well over a hundred million dollars.

70) AEG and Olympia were aware of the increase the sales of the TermiNet printer and GE's concomitant investment in it. In July 1971, Nasko was informed of necessary investments for tooling equipment, factory space, software testing development, and LSI Mosfet "chips" which were incurred by

GE in preparing to manufacture the TermiNet printer. Over the years, Nasko's department was informed as GE sales increased and was aware that the TermiNet printer was becoming more and more successful. During the October 1968 meeting in Frankfurt, Dr. Nasko and the other representatives of AEG and Olympia learned that 15 printers had been made. In June 1970, Nasko's department was informed that more than 100 printer units then existed in the United States. Nasko was informed in July 1971 that the TermiNet printer had demonstrated and maintained a good competitive advantage over other products. In November 1973, Nasko's department was informed that GE, since 1969, had produced 25,000 TermiNet printers.

During his visit in October 1971, Reinecke received detailed TermiNet production information including the fact that, since 1968, a group of about 40 development engineers had been working on the TermiNet 300. Reinecke was informed that 10,000 machines had been built and that licenses had been granted to ICL in England and to Toshiba in Japan. In early 1972, the success of the TermiNet printer in the United States and the extremely good market for the TermiNet printer in Europe was disclosed to Reinecke by Wissmann. In October of 1973, Reinecke was informed of the expansion of the TermiNet printer line. In June 1974, Reinecke was informed that:

> GE's current sales figure for terminals is about $50,000,000 and continues to increase at a steady rate.... (Wissmann letter to Reinecke, June 26, 1974).

## CONCLUSIONS OF LAW

The equitable doctrine of laches has been held applicable to suits brought solely at law. *Giddens v. Isbrandtsen Co.,* 355 F.2d 125 (4th Cir. 1966). Indeed, the doctrine of laches has been specifically applied in causes of action charging patent infringement. *Potter Instrument Company, Inc. v. Storage Technology Corporation,* 641 F.2d 190 (4th Cir. 1981); *TWM Manufacturing Co., Inc. v. Dura Corporation,* 592 F.2d 346 (6th Cir. 1979); *Baker Manufac-*

*turing Co. v. Whitewater Manufacturing Co.,* 430 F.2d 1008 (7th Cir. 1970), *cert. denied,* 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971); *Union Shipbuilding Co. v. Boston Iron and Metal Co.,* 93 F.2d 781 (4th Cir. 1938).

"A patent infringement claim may be barred under the doctrine of laches when a party is guilty of substantial and inexcusable delay in prosecuting his claim and such delay is prejudicial to the opposing party." *Siemens Aktiengesellschaft v. Beltone Electronics Corporation,* 381 F.Supp. 57 (N.D.Ill. 1974); *Potter Instrument Co. v. Storage Technology Corporation, supra.* In *Potter,* the Fourth Circuit, *quoting from Studiengesellschaft Kohle MbH v. Eastman Kodak,* 616 F.2d 1315 (5th Cir. 1980), held that: "[t]he laches defense 'may be invoked where the plaintiff has unreasonably or inexcusably delayed in prosecuting its rights and where that delay has resulted in material prejudice to the defendant.' *Eastman Kodak,* 616 F.2d at 1325." 641 F.2d at 191. The existence of laches does not depend merely upon the lapse of time; there must be a concomitant disadvantage to another. *Universal Coin Lock Co. v. American Sanitary Lock Co.,* 104 F.2d 781 (7th Cir. 1939); *Potash Co. of America v. International Minerals & Chemicals Corp.,* 213 F.2d 153 (10th Cir. 1954). The application of the doctrine of laches is vested in the sound discretion of the trial court and necessarily involves a balancing of equities.

> In patent cases it is inequitable for an infringer to deprive the owner of a patent of royalties and other rights which the patent affords. It is equally inequitable for the patent owner to sleep on his rights and lead an infringer to make large investments in the belief that he is not infringing or that the rights are not to be pressed.

*Potash, supra,* at 156; *see also, Rome Grader & Machine Corp. v. J. D. Adams Mfg. Co.,* 135 F.2d 617 (7th Cir. 1943). In *Giddens, supra,* the Fourth Circuit noted that "the presence of laches is ascertained by a balancing of the claimant's delay with the proffered excuse, if any, against the de-

fendant's consequent detriment. The determination demands a weighing of equities. These in turn depend upon an assay of the circumstances." 355 F.2d at 127. "Because the circumstances of each case inevitably differ, no case is an exact precedent for another." *Siemens Aktiengesellschaft v. Beltone Electronics Corporation,* 381 F.Supp. at 60; *Baker Manufacturing Co. v. Whitewater Manufacturing Co., supra,* 430 F.2d at 1011, *quoting Westco-Chippewa Pump Co. v. Delaware Electric & Supply Co.,* 64 F.2d 185, 187 (3rd Cir. 1933). Indeed, in *Galliher v. Cadwell,* 145 U.S. 368, 12 S.Ct. 873, 36 L.Ed. 738 (1891), the Supreme Court enunciated that:

> It is true, that by reason of their differences of fact no one case becomes an exact precedent for another, yet a uniform principle pervades them all. They proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that because of the change in condition or relations during this period of delay, it would be an injustice to the latter to permit him to now assert them.

145 U.S. at 372, 12 S.Ct. at 874.

While laches will not be imputed to a party who has been justifiably ignorant of facts which create his right, mere ignorance will not constitute an excuse for delay in enforcing those rights. "The party must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and the means of knowledge are generally equivalent to actual knowledge." *Potash, supra,* at 155. In *Foster v. Mansfield, Coldwater etc. Railroad,* 146 U.S. 88, 99, 13 S.Ct. 28, 32, 36 L.Ed. 899 (1892), the Supreme Court noted that:

> The defence of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has

been to hold the plaintiff to a rigid compliance with the law which demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to have informed himself of all the facts.

In the present case, Olympia contends that the application of laches is inappropriate because it possessed no "knowledge of its rights" until 1974. In essence, Olympia maintains: 1) that it had no knowledge of the existence of the '704 Patent; and 2) that its contacts with GE regarding the allegedly infringing TermiNet line printer were insufficient to provide it with notice of infringement. Both contentions, however, are factually untenable.

■ Olympia contends that it had no knowledge of the U. S. patent granted to it in 1960 on the line printer developed by Theo Hense. Accordingly, Olympia argues that the absence of this knowledge excuses its lengthy delay in charging infringement and effectively bars the imposition of laches. It is apparent to this court, however, that Olympia should be charged with the knowledge of its ownership of the '704 Patent. Olympia was notified of the issuance of the patent in 1960; the patent issued to Olympia in 1960 is a matter of public record; the files and records in Olympia's Patent Office reflected its ownership of the '704 Patent; and Olympia developed prototypes of the patented Hense line printer in connection with the Omega Project in the early 1960's. As the Supreme Court enunciated in *Underwood v. Dugan,* 139 U.S. 380, 384, 11 S.Ct. 618, 619, 35 L.Ed. 197 (1890), "[O]wnership of property implies ... attention to it..." Olympia cannot escape the application of laches by merely pleading ignorance of its own patent.

> A complainant in a suit in equity, to relieve himself of a charge of laches, must not only have been diligent in asserting his rights after they were discovered by him, but he must have exercised due diligence to inform himself. And he is properly chargeable with all the knowledge that due diligence would have disclosed to him.

*Atlantic Life Insurance Company v. Rowland, et al.,* 22 F.2d 126, 129 (4th Cir. 1927) *quoted in Wyant v. Brennan,* 85 F.2d 920, 922 (4th Cir. 1936). By the exercise of due diligence, Olympia could have checked its records and discovered that it owned a patent on the line printer principle. Accordingly, Olympia may not reasonably rely on its failure to apprise itself of its own property as an excuse for its delay in enforcing its rights. *See also, Dymo Industries, Inc. v. Monarch Marketing Systems,* 474 F.Supp. 412 (N.D.Tex.1979).

■ Moreover, it is apparent from the facts of this case that Olympia was aware of the existence of the allegedly infringing GE TermiNet printer as early as October 4, 1968. On October 4, 1968, GE representatives discussed the design and operation of the GE line printer with Olympia officials at Olympia's plant in Wilhelmshaven. Throughout the next six years GE periodically engaged in licensing negotiations with Olympia officials and provided Olympia with design data, technical specifications and manufacturing requirements for the TermiNet line printer. In addition, in 1971, Olympia received a sample TermiNet printer from GE and Olympia officials toured GE's manufacturing facilities in Waynesboro, Virginia. Moreover, the GE line printer was, throughout this period, demonstrated at industrial trade fairs and technically discussed in trade publications. It is evident that starting in October, 1968, responsible officials at Olympia were put on notice of the existence of the allegedly infringing TermiNet printer. Notice to these high level management officials clearly constitutes notice to Olympia.

■ In *Eastman Kodak, supra,* the Fifth Circuit noted that:

To determine the length of plaintiff's delay, the court must look not to the date on which the patent issued but rather to the time at which the plaintiff knew or, in the exercise of reasonable diligence, should have known of the defendant's alleged infringing action.

616 F.2d at 1326. "The relevant time period for purposes of laches begins to run

when a patentee has either actual or constructive knowledge of the alleged infringement." *Dymo Industries, supra,* at 414; *General Electric Co. v. Sciaky Bros., Inc.,* 304 F.2d 724 (6th Cir. 1964); *Potter Instrument Co., Inc. v. Storage Technology Corp.,* 207 USPQ 763, 767 (E.D.Va.1980), *aff'd,* 641 F.2d 190 (4th Cir. 1981). The time period stops when the patentee files suit against the alleged infringer. *See Potter, supra,* 207 USPQ at 767.

Courts addressing the issue of the applicability of laches in the patent context have most frequently been concerned with inexcusable delay in commencing suit after an initial notification of infringement. *See, e.g., Continental Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375 (7th Cir. 1972); *American Home Products Corp. v. Lockwood Mfg. Co.,* 483 F.2d 1120 (6th Cir. 1973) *cert. denied,* 414 U.S. 458, 94 S.Ct. 917, 39 L.Ed.2d 110 (1974); *Rome Grader & M. Corp. v. J. D. Adams Mfg. Co.,* 135 F.2d 617 (7th Cir. 1943). "Where this period exceeds the applicable six-year period set forth in the statute of limitations, 35 U.S.C. § 286, or can otherwise be deemed unreasonable, injury to the defendant is presumed and the burden is upon the plaintiff to excuse the procrastination." *Siemens Aktiengesellschaft v. Beltone Electronics Corp.,* 381 F.Supp. 57, 60–61 (N.D.Ill.1974) *Potter, supra,* 641 F.2d at 191.

■ In this case, if the delay is to be measured from the date that Olympia first learned of GE's TermiNet printer, October 4, 1968, to the date this suit was commenced, a period of over eight years, the delay may be deemed unreasonable as a matter of law.

Olympia provides no excuse for its delay in filing suit other than its lack of knowledge regarding the existence of the '704 Patent. The plaintiff has been given every opportunity to justify its lengthy delay in bringing its infringement suit but has wholly failed to do so. The plaintiff offers no legally adequate excuse for its inaction.

In the present case, prompt notification to GE would have informed the accused

infringer that a suit against it might be filed. Such notification may have caused GE to alter its plans to develop the Termi-Net line printer, and at least would have caused GE to maintain its royalty reserve fund. In any event, any subsequent decision by GE to proceed with the development of the TermiNet printer would have been made with complete knowledge of the risk of litigation and GE could have taken steps to mitigate any losses attendant upon an adverse result in such a suit. In sum, considering the applicable delay to be that between the date that Olympia first learned of GE's allegedly infringing line printer and the date suit was filed, plaintiff's dereliction has not been sufficiently explained and was both unreasonable and inexcusable.

Olympia contends, however, that the period of delay should be measured from the date the notice of infringement was mailed to GE. Measured by this standard, the period of delay is less than two years during which time the parties engaged in active licensing and settlement negotiations. Olympia seeks to bolster this determination of the applicable period of delay by citing the Fourth Circuit's decision in *Potter, supra.* Such reliance, however, is misplaced. While the period of delay in *Potter* was measured from the notice of infringement to the filing of suit for two of the alleged patent infringers, the delay was measured from the time "constructive knowledge" was acquired to the filing of suit for the other two defendants. One plaintiff in *Potter* "never asserted any infringement claim under the '894 patent against CDC until the filing of this suit in 1979." 207 USPQ at 966. Nevertheless, the district court reasoned that the period for measuring delay commenced when plaintiff "knew or should have known," *id.,* that defendant CDC was marketing the allegedly infringing product. Application of the standard enunciated by the district court in *Potter* and affirmed by the Fourth Circuit to the facts of the present case mandates a determination that the time period for measuring laches commences when Olympia obtained knowledge of the GE line printer.

Olympia further contends that the period of inexcusable delay should terminate with its transmission of the notice of infringement to Olympia in 1974. Olympia argues that from that date until the time suit was filed in 1976 it was engaged in good faith licensing and settlement negotiations with GE. *In Mogavero v. McLucas,* 543 F.2d 1081 (4th Cir. 1976), the Fourth Circuit held that a period of settlement negotiations conducted prior to filing suit should not be considered in determining the period of inexcusable delay for laches. The court reasoned "[i]n the interest of encouraging disputants to settle claims prior to the institution of litigation, we conclude that such a period should not be counted for purposes of laches." *Id.,* at 1083. Accordingly, measured by this standard, the appropriate period of delay for the purposes of laches in this case commences with Olympia's acquisition of knowledge of GE's TermiNet printer, October 4, 1968, and ends with Olympia's transmission of the notice of infringement to GE, October 21, 1974. This period is longer than the applicable statute of limitations, and accordingly, raises a presumption of prejudice to GE. Under such circumstances, laches is appropriate.

Olympia has not introduced evidence sufficient to overcome the presumption of prejudice. Indeed, GE has demonstrated considerable prejudice from the delay. The court finds from the evidence that the defendants have been seriously and irreparably prejudiced by the plaintiff's delay in filing this patent suit. Prejudice "contemplates the disposal and inaccessibility of witnesses, the dimming of recollections and other disadvantages incident to the lapse of time." *Giddens v. Isbrandtsen,* 355 F.2d 125, 127 (4th Cir. 1966). It is evident from the facts in this case that GE has been materially prejudiced by Olympia's delay in enforcing its rights. The expansion of an infringer's business is the kind of prejudice which will support the defense of laches. *Continental Coatings Corporation v. Metco, Inc., supra.* In this case, GE has invested millions of dollars in research and develop-

ment, equipment purchases and in marketing the TermiNet printer. Olympia and GE employees material to the equitable resolution of this case have passed away during this period of time and relevant documents have been lost. In addition, in 1972, GE abandoned the royalty reserve fund it established for any potential TermiNet patent litigation. Had Olympia timely notified GE of potential infringement and timely prosecuted an infringement action, GE would have had the opportunity of continuing the royalty reserve. *See TWM Manufacturing Co., Inc. v. Dura Corp.*, 189 USPQ 274 (E.D. Mich.1975), *rev'd on other grounds*, 592 F.2d 346 (6th Cir. 1979). Long delay, the death of witnesses, GE's commitment to the development of the TermiNet printer, and the extensive financial outlay by defendant all are factors which would seriously prejudice defendant were it forced to defend a suit at this time. *See, Smith v. Sinclair Refining Co.*, 257 F.2d 328 (2nd Cir. 1958); *Potash, supra; Advanced Hydraulics v. Eaton Corp.*, 415 F.Supp. 283 (N.D.Ill.1976). "[D]efendant has been damaged not only by what it did in reliance on the inaction and apparent acquiescence of the plaintiff but also by what it might have done had the holders of the patent acted in a manner consistent with one whose rights were being violated by another." *TWM, supra*, 189 USPQ at 280.

Olympia further contends that GE acted with "unclean hands" when it failed to notify Olympia of the potential patent infringement. An alleged patent infringer possesses no affirmative duty to notify the patentee of any potential infringing actions. *Baker Manufacturing Co., supra*, 430 F.2d at 1013; *Coleco Industries, Inc. v. Mengo Industries, Inc.*, 525 F.Supp. 823 (E.D.Wis.1981). In the absence of any evidence at trial that GE acted in bad faith, its knowledge of the '704 Patent does not bar the imposition of laches. *Lukens Steel Co. v. American Locomotive Co.*, 197 F.2d 939, 941 (2nd Cir. 1952).

Accordingly, final judgment will be entered for the defendant on the basis of laches.